UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

EVANSTON INSURANCE COMPANY,

Plaintiff,

-against-

MCIC VERMONT, INC. and NEW YORK
PRESBYTERIAN HOSPITAL,

Defendants.
-------------------------------------------------------------------------x

```
FILED
JUL 2 8 2008
USDC WP SDNY
```

Docket No.

**COMPLAINT**

# 08 CIV. 6699

Plaintiff, EVANSTON INSURANCE COMPANY ("Evanston"), by and through its attorneys, TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP, as and for its Complaint for declaratory relief, alleges upon information and belief, the following:

## INTRODUCTION

1.      This is an action for monetary damages including the recovery of amounts paid by the Plaintiff as indemnity and defense costs under an insurance policy issued to Daniel H. Smith, M.D. ("Dr. Smith"), which should have been paid by Defendants MCIC and/or New York-Presbyterian Hospital ("NYP") in connection with an underlying action.

2.      An actual and justiciable controversy exists among the parties as to which an award of monetary damages is necessary and appropriate.

## JURISDICTION

3.      This Court has original jurisdiction over this civil action under 28 U.S.C. §1332(a).

4.      Plaintiff, Evanston, is a corporation incorporated under the laws of the State of Illinois, having its principal place of business at Ten Parkway North, Deerfield, in the State of Illinois.

5.      Defendant New York-Presbyterian Hospital is a corporation incorporated under the

laws of the State of New York having its principal place of business at 525 East 68th Street , New York, in the State of New York.

6.      Defendant MCIC Vermont, Inc. is a corporation incorporated under the laws of the State of Vermont having its principal place of business at 76 St. Paul Street, Suite 500, Burlington, in the State of Vermont.

7.      No defendants are domiciled in the State of Illinois, and the defendants are domiciled in New York and Vermont, respectively.  Plaintiffs and defendants are, therefore, citizens of different states and this Court has original jurisdiction over this civil action based upon diversity of citizenship under 28 U.S.C. §1332(a).

8.      The amount in controversy, exclusive of costs and interest, exceeds the sum of $75,000.

## VENUE

9.      In this action, plaintiff seeks a monetary judgment with respect to insurance coverage for Dr. Smith in a lawsuit captioned *Joseph Bartscherer as Executor of the Estate of Diane Shamash Bartscherer, deceased, and Joseph Bartscherer, individually v. Daniel H. Smith, M.D.*, Supreme Court of the State of New York, County of Kings, Index No. 39246/2005 (the "Underlying Action"). The Underlying Action arose out of alleged medical malpractice during the continuing course of treating Mrs. Bartscherer from 1993 to January 2005,  by failing to detect, diagnose and treat her for cancer, improperly allowing the cancer to spread and leading to her death in 2006.  The suit alleged that Dr. Smith treated Mrs. Bartscherer while he was on staff at NYP in New York, New York and while he was on staff at Northern New Jersey Cancer Center in Hackensack, New Jersey.

10.      Venue in this District is proper, pursuant to 28 U.S.C. § 1391(a)(2), as a substantial

2

part of the events, acts, or omissions giving rise to the asserted claim took place in this District and

at least one of the insurance policies at issue in this matter was issued in this District.

### NATURE OF CONTROVERSY

11.    Evanston issued Physicians, Surgeons and Dentists Professional Liability Insurance

Policy No. MM-810486 to Daniel H. Smith, M.D. for the policy period May 1, 2005 to May 1, 2006

on a claims-made basis subject to a retroactive date of May 1, 2003 (hereinafter "the Evanston

policy"). A copy of Policy No. MM-810486 is annexed hereto as Exhibit "A."

12.    The Policy is subject to limits of liability of $1,000,000 each claim, each insured and

$3,000,0000 aggregate for all claims, each Insured, and is further subject to a limit of $1,000,000

single per patient claim, all insureds for all coverages combined. The policy provides for a $25,000

deductible applicable to each claim, excluding claim expenses.

13.    The Policy also contains the following condition to coverage:

> **4. Other Insurance :** This insurance shall be in excess of the amount
> of the applicable deductible of this policy and any other valid and
> collectible insurance available to the insured whether such other
> insurance is stated to be primary, contributory, excess, contingent or
> otherwise, unless such other insurance is written only as specific
> excess over the limits of liability provided in this policy.

14.    MCIC issued Professional/Commercial Liability Policy No. PR1106 to The New

York and Presbyterian Hospital for the policy period January 1, 2006 to January 1, 2007 on a claims-

made basis subject to a retroactive date of July 1, 1978 (hereinafter "the MCIC policy"), which

provided coverage to Dr. Smith. A copy of Policy No. PR1106 is annexed hereto as Exhibit "B".

15.    The MCIC policy contains Endorsement No. 2, which provides that the MCIC policy

is subject to limits of liability for Part 1. Professional Liability of $8,000,000 each claim and no

annual aggregate for The Columbia University Medical Center of The New York and Presbyterian

Hospital and its predecessor The Presbyterian Hospital in the City of New York.

16.    The MCIC Policy also contains the following condition to coverage:

**6. Other Insurance :**

Except when an Insured has other insurance which would apply to the Claim covered under Part 2 of this policy, the insurance afforded by this policy is primary insurance, except when this insurance is stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the Claim on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the Claim on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the Damages than that stated in the applicable contribution provision below:

(a)    CONTRIBUTION BY EQUAL SHARES: If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of any Damages than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit if [sic] liability under any one policy or the full amount of the Damages is paid, and with respect to any amount of Damages not so paid, the remaining insurers then continue to contribute in equal shares of the remaining amount of the Damages until such insurer has paid its limit in full or the amount of the Damages is paid.

(b)    CONTRIBUTION BY LIMITS: If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such Damages bears to the total applicable limit of liability of all valid and collectible insurance against such Damages.

4

17.    Based on the foregoing, the MCIC policy applies as primary insurance and the Evanston policy applies as excess insurance above the MCIC layer.

**The Underlying Action**

18.    Upon information and belief, the Complaint in the Underlying Action was filed on or about December 29, 2005. A copy of the Complaint is annexed hereto as Exhibit "C."

19.    The Complaint in the Underlying Action alleges that the defendant rendered medical care to Mrs. Bartscherer from on or about November 1993 through a continuous course of treatment ending in or about January 2005, during which Dr. Smith failed to diagnose cancer. The alleged acts of negligence and/or omissions were alleged to have taken place at Dr. Smith's offices in New York at 161 Ft. Washington Avenue, Manhattan and in New Jersey at 20 Prospect Avenue, Suite 801, Hackensack.

20.    As set forth in the Underlying Action, Mrs. Bartscherer allegedly sustained injuries including hysterectomy, cervical cancer, uterine cancer, metastasis to the lymph nodes of both ovaries, chemotherapy, radiation and pain and suffering and alleged that such were caused by Dr. Smith's negligence and/or omissions.

21.    MCIC and Evanston jointly afforded Dr. Smith a defense in the Underlying Action, sharing defense costs on an equal shares basis. Evanston's defense was afforded subject to a reservation of rights to deny coverage on various grounds.

22.    In January 2008, the Underlying Action was settled for a total of $5,800,000. Of that amount, NYP and/or MCIC paid $4,800,000 and Evanston paid $1,000,000. A copy of the Releases are annexed hereto as Exhibit "D."

**Dispute Between Evanston and NYP/MCIC**

23.     Prior to the settlement, Evanston advised Dr. Smith, NYP and MCIC by letter dated October 31, 2007, that based on the policies' respective "other insurance" clauses, NYP/MCIC's coverage applied as primary and Evanston's applied as excess insurance, thus the settlement should be funded by NYP/MCIC. A copy of that letter is annexed hereto as Exhibit "E".

24.     In response, however, by letter dated November 8, 2007, NYP/MCIC took the position that the policies' "other insurance" clauses did not apply. A copy of that letter is annexed hereto as Exhibit "F".

25.     Although Evanston attempted to resolve the "other insurance" issue with MCIC, NYP and MCIC refused and threatened to settle only a portion of the suit against Dr. Smith if Evanston refused to contribute toward a settlement, even though the demand was within MCIC's policy limits.

26.     Thereafter, by letter dated November 14, 2007, Dr. Smith demanded that the suit be settled. A copy of that letter is annexed hereto as Exhibit "G". Although Evanston attempted again to resolve the issue of priority of coverage, including proposing an immediate mediation to do so, NYP and MCIC refused. By letter dated December 18, 2007, Evanston participated in the settlement only with the understanding that any such payment was not voluntary and subject to reservation of rights as to all coverage issues that exist as between NYP, MCIC and Evanston. A copy of that letter is annexed hereto as Exhibit "H".

## COUNT I
### (CONTRIBUTION)

27.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "26" of this Complaint as if fully set forth at length herein.

6

28.    By virtue of the policies' "other insurance" clauses, the MCIC policy is primary and the Evanston policy is excess. Because the $5,800,000 settlement falls within MCIC's $8,000,000 policy limit, Plaintiff's limit was never reached and Evanston's payment of $1,000,000 was in excess of its contractual share of indemnity under the respective insurance policies.

29.    Because the MCIC policy is primary by virtue of the policies' "other insurance" clauses, Evanston is also entitled to reimbursement of the amount of defense costs that it paid in connection with Dr. Smith's defense in the Underlying Action.

30.    Evanston is therefor entitled to contribution from NYP/MCIC in the amount of $1,000,000 plus the amount that Evanston paid toward defense costs in the Underlying Action.

## COUNT II
### (EQUITABLE CONTRIBUTION)

31.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "30" of this Complaint as if fully set forth at length herein.

32.    Evanston involuntarily paid the $1,000,000 amount toward settlement subject to its reservation of rights only because NYP and MCIC improperly threatened to settle only part of the underlying action, potentially prejudicing Dr. Smith, and because Dr. Smith demanded that the suit be settled.

33.    The settlement amount falls wholly within MCIC's primary $8,000,000 policy limit and should have been paid in full by NYP and/or MCIC without contribution from Evanston.

34.    Evanston is therefore entitled to recover its $1,000,000 payment, plus the amount it paid toward Dr. Smith's defense costs in the Underlying Action, from NYP and/or MCIC based on principles of equitable contribution.

## COUNT III
### (SUBROGATION)

35.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1"

through "34" of this Complaint as if fully set forth at length herein.

36.     The "other insurance" clauses of the MCIC and Evanston insurance policies provide

that MCIC's policy provides primary insurance to Dr. Smith for this loss and Evanston's policy

provides excess insurance.

37.     The $5,800,000 settlement amount falls wholly within MCIC's limits of liability, thus

NYP and/or MCIC were liable for this settlement in its entirety without contribution from Evanston.

38.     Evanston nevertheless was forced to contribute $1,000,000 toward the settlement

involuntarily based on NYP and MCIC's threat to settle only part of the underlying suit against Dr.

Smith.

39.     Dr. Smith was entitled to indemnification of the full $5,800,000 settlement amount

under the MCIC policy, including any applicable SIRs and/or deductibles attributable to NYP,

because the settlement amount was within the MCIC policy limit, which is primary based on the

policies' "other insurance" clauses.

40.     Evanston is entitled to reimbursement of the $1,000,000 it paid involuntarily on Dr.

Smith's behalf under its excess policy, plus the amount it paid toward Dr. Smith's defense costs in

the Underlying Action, because Evanston was only secondarily liable to Dr. Smith based on the

policies' "other insurance" clauses.

## COUNT IV
### (EQUITABLE SUBROGATION)

41.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1"

8

through "40" of this Complaint as if fully set forth at length herein.

42.    The "other insurance" clauses of the MCIC and Evanston insurance policies provide that MCIC's policy provides primary insurance to Dr. Smith for this loss and Evanston's policy provides excess insurance.

43.    The $5,800,000 settlement amount falls wholly within MCIC's limit of liability, thus NYP and/or MCIC were liable for the settlement in its entirety without any contribution from Evanston.

44.    Evanston nevertheless was forced to contribute $1,000,000 toward the settlement involuntarily based on NYP and MCIC's threat to settle only part of the underlying suit against Dr. Smith.

45.    Dr. Smith was entitled to indemnification of the full $5,800,000 settlement amount under the MCIC policy, including any applicable SIRs and/or deductibles attributable to NYP, because the settlement amount was within the MCIC policy limit, which is primary based on the policies' "other insurance" clauses.

46.    Evanston is entitled to reimbursement of the $1,000,000 it paid involuntarily on Dr. Smith's behalf under its excess policy, plus the amount it paid toward Dr. Smith's defense costs in the Underlying Action, because Evanston was only secondarily liable to Dr. Smith based on the policies' "other insurance" clauses.

## REQUEST FOR RELIEF

**WHEREFORE**, plaintiff Evanston Insurance Company respectfully requests that this Court enter judgment in the amount of $1,000,000 plus the amount that Evanston paid toward defense costs in the Underlying Action, plus  interest, costs, and attorneys' fees against NYP and MCIC,

9

together with such other and further relief as this court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated:    Hawthorne, New York
          July 28, 2008

TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP

By: _____

Cheryl P. Vollweiler (CPV9951)
*Attorney for Plaintiff*
*Evanston Insurance Company*
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532
(914) 347-2600

TO:

MCIC Vermont, Inc.
76 St. Paul Street, Suite 500
Burlington, Vermont 05401

New York Presbyterian Hospital
525 East 68th Street
New York, New York 10065

10

# EXHIBIT A

# ▟ EVANSTON INSURANCE COMPANY

MARKEL®

Policy No.   MM-810488
Prev. No.    MM-808921
Prod. No.    26550

## DECLARATIONS - PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY INSURANCE

**Claims Made Policy:** This policy is limited to liability for only those CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. Please review the policy carefully.

**New Jersey Notice:** This policy contains a Sexual Acts Exclusion. Please refer to the policy.

1. **NAMED INSURED:**

   (a)  Coverage A: Individual Liability Coverage:   DANIEL H. SMITH, M.D.

   (b)  Coverage B: Association, Corporation or Partnership Liability Coverage:  Not Applicable

2. **BUSINESS ADDRESS OF THE INSURED:**
   20 PROSPECT AVENUE, SUITE 703
   HACKENSACK, NJ 07601

3. **PROFESSIONAL SPECIALTY OF THE INSURED:**   Gynecology and Oncology Services Performed on Staff at Northern New Jersey Cancer Association

4. **POLICY PERIOD:**   From May 1, 2005 to May 1, 2006
   12:01 A.M. Standard Time at address of Insured stated above.

5. **RETROACTIVE DATE:** May 1, 2003

6. **COVERAGE AND LIMITS OF LIABILITY:**

   **COVERAGE A:**   (a)  Each Claim,
   Each Insured:                         $ 1,000,000

   (b)  Aggregate For All Claims,
   Each Insured:                         $ 3,000,000

   **COVERAGE B:**   (c)  Each Claim,
   Each Insured                          Not Applicable

   (d)  Aggregate For All Claims,
   Each Insured:                         Not Applicable

   **COVERAGE A, COVERAGE B AND BOTH COMBINED:**

   (e)  Single Per Patient Claim,
   All Insureds:                         $ 1,000,000

   **POLICY LIMIT:**   Subject to Coverage A and Coverage B above, the Total Aggregate Limit of Liability for the Policy Period, including the Optional Extension Period, for All Claims, All Insureds:                         $ 3,000,000

7. **DEDUCTIBLE:**
   Applicable to each claim, excluding claim expenses:                         $   25,000

8. **PREMIUM FOR POLICY PERIOD:**                         $   179,775.00

Page 1

9. **OPTIONAL EXTENSION PERIOD:**

12 months at 150% of the full annual premium; 24 months for 200% of the full annual premium; or 36 months at 250% of the full annual premium hereunder

10. The insured is not a proprietor, superintendent, executive officer, director, partner, or trustee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, or any business enterprise and not named in Item 1 hereinabove, except as follows:

None

11. **ENDORSEMENTS ATTACHED AT POLICY INCEPTION:**

1. EIC 4115-01    25% Minimum Earned Premium Endorsement

ALL CLAIMS TO BE REPORTED DIRECTLY TO

Shand Morahan & Company, Inc.
Ten Parkway North, Suite 100
Deerfield, Illinois 60015
Phone: (847) 572-6000, Fax: (847) 572-6338

Policy Form: EIC 603-1-NJ 8/01
Dec; EIC 603-5 NJ 4/03
Date Printed: April 26, 2005

*Michael A. Rosenberg*
Authorized Representative



# EVANSTON INSURANCE COMPANY

## Endorsement

Named Insured:
DANIEL H. SMITH, M.D.

Policy No.: MM-810488
Endorsement No.: 1
Effective Date: May 1, 2005

### 25% MINIMUM EARNED PREMIUM ENDORSEMENT

In consideration of the premium paid, it is hereby understood and agreed that in the event that this policy is cancelled by the Named Insured, the policy premium is subject to a minimum earned premium of twenty-five percent (25%) of the total premium.

All other provisions of the policy shall apply and remain unchanged.

_Michael A. Rosenberg_
Authorized Representative

EIC 4115-01 2/03

# Physicians, Surgeons and Dentists Professional Liability Insurance Policy

In consideration of the payment of the premium, the undertaking of the Named Insured to pay the deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached hereto and made a part hereof, and subject to the limits of liability shown in the Declarations, and subject to all the terms of this insurance, the Company agrees with the Named Insured as follows:

## THE INSURED

The unqualified word "Insured" whenever used in this policy means:

(a) under Coverage A: Individual Professional Liability, each individual described as the Named Insured in Item 1.(a) of the Declarations;

(b) under Coverage B: Association, Corporation or Partnership Liability, the association, corporation or partnership described in Item 1.(b) of the Declarations and any member, stockholder or partner thereof with respect to acts or omissions of others, provided that no member, stockholder or partner shall be an Insured under this paragraph (b) with respect to liability for his personal acts of a professional nature;

(c) under Coverage A: Individual Professional Liability and Coverage B: Association, Corporation or Partnership liability, any temporary substitute physician utilized by the Insured but only to continue the practice on behalf of the Insured in his absence;

(d) the heirs, executors, administrators, assigns and legal representatives of each Insured above in the event of his death, incapacity or bankruptcy.

## THE COVERAGE

**1. Professional Liability and Claims Made Clause:** To pay on behalf of the Insured all sums in excess of the deductible amount stated in Item 7. of the Declarations which the Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD:

(a) Coverage A—Individual Professional Liability: because of Malpractice or Personal Injury, sustained by a patient and committed by the individual Insured, or by any person for whose acts or omissions the Insured is legally responsible, except as a member, stockholder or partner of an association, corporation, or partnership, arising out of the professional activities of the Insured as a medical or dental practitioner;

PROVIDED ALWAYS THAT such Malpractice or Personal Injury happened subsequent to the Retroactive Date specified in Item 5. of the Declarations.

(b) Coverage B—Association, Corporation or Partnership Liability: because of Malpractice or Personal Injury, sustained by a patient and committed by any person for whom the association, corporation or partnership is legally responsible, arising out of the practice of medicine or dentistry;

PROVIDED ALWAYS THAT such Malpractice or Personal Injury happened subsequent to the Retroactive Date specified in Item 5. of the Declarations.

It is a condition precedent to coverage under this policy that all claims be reported in compliance with the section CLAIMS 1: Notice of Claim or Suit.

**Claim** means whenever used in this policy, a demand received by the Insured for money or services, including the service of suit or institution of arbitration proceedings against the Insured.

EIC 603-1—NJ 8/01

Page 1

**Malpractice** means, whenever used in this policy, an act, error or omission in professional services rendered or that should have been rendered including services by an individual Insured as a member of a formal accreditation or similar professional board or committee of a hospital at which he is a staff member.

**Personal Injury** means, whenever used in this policy:

    (a)    any physical or mental injury to or death of any patient;

    (b)    false arrest, detention, or imprisonment, and malicious prosecution or humiliation except when inflicted by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification;

    (c)    the publication or utterance of a libel or slander or a publication or an utterance in violation of a patient's right to professional confidence, except when published or uttered by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification.

**Policy Period** means, whenever used in this policy, the period from the inception date of this policy to the policy expiration date as set forth in Item 4. of the Declarations or its earlier termination date, if any.

**2.**     **Defense, Settlement:** With respect to the Insurance afforded by this policy, the Company shall defend any claim or suit against the Insured seeking damages to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent. Subject to section LIMITS OF LIABILITY 3, the Company may make such investigation and settlement of any claim or suit as it deems expedient but the Company shall not be obligated to pay any claim or judgment or to defend or continue to defend any suit or claim after the applicable limit of the Company's liability has been exhausted.

**3.**     **Discovery Clause:** If during the policy period or any Optional Extension Period purchased hereunder, the Insured first becomes aware of Malpractice or Personal Injury to which this policy applies, and if the Insured shall during the policy period or the Optional Extension Period purchased hereunder give written notice to the Company of:

    (a)    the specific act, error or omission; and

    (b)    the injury or damage which has or may result from such act, error or omission; and

    (c)    the circumstances by which the Insured first became aware of such act, error or omission;

then any claim subsequently made against the Insured arising out of such Malpractice or Personal Injury shall be deemed for the purposes of this insurance to have been made during the policy period or the Optional Extension Period purchased hereunder.

The Insured shall cooperate fully with the Company as provided in section CLAIMS 1 and 2, and any investigation conducted by the Company or its representatives shall be subject to the terms set forth in this policy.

**4.**     **Other Insurance:** This insurance shall be in excess of the amount of the applicable deductible of this policy and any other valid and collectible insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess over the limits of liability provided in this policy.

**5.**     **Option to Extend the Claims Reporting Period:** In the event of the termination of this insurance by reason of non-renewal or cancellation by the Insured or if the Company shall cancel coverage or terminate it by refusing to renew, for reasons other than the Insured's non-payment of premium and/or deductible or non-compliance with the terms and conditions of this policy, then the Insured upon payment of an additional premium as set forth herein shall have the option to extend the claims reporting period, subject otherwise to its terms, limits of liability, exclusions and conditions to apply to CLAIMS FIRST MADE AGAINST THE INSURED within the Optional Extension Period set forth in Item 9. of the Declarations immediately following the effective date of such cancellation or non-renewal but only by reason of Malpractice or Personal Injury which happened subsequent to the Retroactive Date and prior to the effective

date of such cancellation or non-renewal, and which is otherwise covered by this insurance. This shall be hereinafter referred to as the OPTIONAL EXTENSION PERIOD.

If however, this insurance is succeeded within thirty (30) days by CLAIMS MADE insurance coverage on which the Retroactive Date is the same as or earlier than that shown in Item 5, of the Declarations of this policy, the succeeding insurance shall be deemed to be a renewal hereof, and in consequence the Named Insured shall have no right to secure an Optional Extension Period.

The quotation of a different premium and/or deductible and/or limit of liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

This Optional Extension Period shall not be available when any Insured's license or right to practice his profession is revoked, suspended or surrendered.

As a condition precedent to the Insured's right to purchase the Optional Extension Period coverage, the full annual premium of this policy and any deductibles that are due must have been paid.

The Insured's right to purchase the Optional Extension Period coverage must be exercised by notice in writing not later than thirty (30) days after the cancellation or termination date of this policy AND MUST INCLUDE PAYMENT OF PREMIUM FOR THE OPTIONAL EXTENSION PERIOD as well as payment for all premiums and/or deductibles due the Company. If such notice and premium is not so given to the Company, the Insured shall not at a later date be able to exercise such right.

At the commencement of any Optional Extension Period, the entire premium therefor shall be deemed earned, and in the event the Insured terminates the Optional Extension Period before its term for any reason, the Company shall not be liable to return to the Insured any portion of the premium paid for the Optional Extension Period.

The fact that this policy is extended by virtue of the Optional Extension Period shall not in any way increase the limits of liability set forth in Item 6, of the Declarations.

## THE EXCLUSIONS

**This Policy Does Not Apply:**

(a)  to any act committed in violation of any law or ordinance; to any claim based upon or arising out of any dishonest, fraudulent, criminal, malicious, knowing, wrongful, deliberate, or intentional acts, errors or omissions committed by or at the direction of the Insured;

(b)  to punitive or exemplary damages, fines or penalties, except that if a suit shall have been brought against the Insured for a claim falling within the coverage hereof, seeking both compensatory and punitive or exemplary damages, fines or penalties, then the Company will afford a defense to such action, without liability, however, for such punitive or exemplary damages, fines or penalties;

(c)  to any claim based upon or arising out of discrimination by the Insured on the basis of race, creed, age, sex, sexual preference, physical handicap or national origin;

(d)  to any claim against the Insured for or arising out of any act, error or omission committed or alleged to have been committed by the Insured which in any manner relates to or arises out of the actual, alleged or threatened discharge, dispersal, release, escape or existence of pollutants, hazardous substances, toxic substances or substances which in any manner impair or allegedly impair the environment or which result in bodily injury or property damage;

(e)  to any liability arising out of the Insured's activities in his capacity as proprietor, superintendent, executive officer, director, partner or trustee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory or any business enterprise not named as an Insured under this policy unless such activities are disclosed in the application and listed in Item 10, of the Declarations.

(f) to the performance by dentists or dental surgeons of

    (i) general anesthesia;

    (ii) any procedure carried out under general anesthesia unless performed in a hospital, surgi-center or office surgical suite, accredited by the Joint Commission on Accreditation of Healthcare Organizations or the American Osteopathic Association, for the United States. or by the Canadian Council on Hospital Accreditation, for Canada.

(g) to the liability of others assumed by the Insured under any contract or agreement, unless such liability would have attached to the Insured even in the absence of such contract or agreement;

(h) to any claim arising out of general liability, or goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name;

(i) to liability arising out of the ownership, maintenance, operation, use, loading or unloading of any vehicle, watercraft or aircraft;

(j) to any claim based upon or arising out of (1) the use of excessive influence or power on any patient or (2) any actions intended to lead to or culminate in any sexual acts. However, the Company does agree to defend any such claim, subject to the applicable limits of liability, until a final judgment has been determined. If judgment is rendered against the Insured, the Named Insured, upon written demand by the Company, agrees to reimburse the Company for all claim expenses incurred in the defense of such claim, within ten (10) days.

(k) to any claim based upon or arising out of the professional services rendered or that should have been rendered by the Insured, while under the influence of any chemical dependency. However, the Company does agree to defend any such claim until a final judgment has been determined. If a judgment is rendered against the Insured, the Named Insured, upon written demand by the Company, agrees to reimburse the Company for all claim expenses incurred, within ten (10) days.

(l) to any obligation for which the Insured or any carrier as his insurer may be held liable under any Workers' Compensation, unemployment compensation or disability benefits law, or under any similar law;

(m) to any claim based upon or arising out of any employment dispute, or to personal injury to, or sickness, disease or death of any employee of the Insured arising out of, and in the course of his employment by the Insured;

(n) to use, administration or prescription of any drug, pharmaceutical or medical device which has not received final approval by the Federal Drug Administration (FDA) for treatment of human beings or which is not used, administered or prescribed as part of an FDA approval study.

## TERRITORY

The insurance afforded by this policy applies worldwide except for People's Republic of China, Cuba, Islamic Republic of Iran, Iraq, Korean People's Republic, Libya and Socialist Republic of Viet Nam.

Any claim must be made and suit must be brought within the United States of America, its territories and possessions, Puerto Rico or Canada.

## LIMITS OF LIABILITY

1. **COMPANY'S LIMITS OF LIABILITY:**

   As stated in Item 6. of the Declarations, Coverage and Limits of Liability:

   (a)   COVERAGE A:

       (i)   <u>Limit of Liability/Each Claim</u>

           The liability of the Company for loss payments against each COVERAGE A Insured for each claim shall not exceed the amount stated in Item 6.(a) of the Declarations.

       (ii)   <u>Limit of Liability/Aggregate</u>

           Subject to the liability of the Company for each claim against each COVERAGE A Insured the liability of the Company for all claims against each COVERAGE A Insured shall include and be applicable to damages paid or incurred by or on behalf of each COVERAGE A Insured and shall not exceed the aggregate amount stated in Item 6.(b) of the Declarations.

   (b)   COVERAGE B:

       (i)   <u>Limit of Liability/Each Claim</u>

           The liability of the Company for loss payments against each COVERAGE B Insured for each claim shall not exceed the amount stated in Item 6.(c) of the Declarations.

       (ii)   <u>Limit of Liability/Aggregate</u>

           Subject to the liability of the Company for each claim against each COVERAGE B Insured the liability of the Company for all claims against each COVERAGE B Insured shall include and be applicable to damages paid or incurred by or on behalf of each COVERAGE B Insured and shall not exceed the aggregate amount stated in Item 6.(d) of the Declarations.

   (c)   Coverage A, Coverage B & Both Combined:

       Subject to (a) and (b) above, one or more claims made against two or more Insureds under Coverage A or Coverage B or both combined arising out of Malpractice or Personal Injury sustained by one patient shall be a single patient claim to which the limit of liability for "Single Per Patient Claim" shall apply to all Insureds. The total liability of the Company shall not exceed the "Single Per Patient Claim" as set forth in Item 6.(e) of the Declarations regardless of the number of Insureds against whom claim is made or suit is brought by or on behalf of one patient. All such claims, whenever made, shall be considered FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD including the Optional Extension Period in which the earliest claim arising out of Malpractice or Personal Injury was first made against any Insured and all such claims shall be subject to the same "Single Per Patient Claim" limit of liability.

   (d)   POLICY LIMIT:

       The total limit of liability of the Company for damages for all claims, against all Insureds shall be the amount stated in Item 6. COVERAGE and LIMITS OF LIABILITY: POLICY LIMIT of the Declarations. This aggregate limit of liability of the Company for all claims against all Insureds shall include and be applicable to damages paid or incurred by or on behalf of all Insureds.

   (e)   Apportionment of Losses Against Aggregate Limits:

All sums which the Company pays on behalf of a COVERAGE B Insured organization and one or more COVERAGE A Insured individuals as the result of a claim or as the result of a notice given to the Company pursuant to THE COVERAGE 3. Discovery Clause, shall be apportioned against the Coverage B LIMIT OF LIABILITY and the Coverage A LIMIT OF LIABILITY, provided further that nothing stated herein shall operate to increase the Company's maximum limit of liability for each claim as stated in the Declarations.

Such sums shall be apportioned among the Insureds under this Policy as follows:

(i)    In the event notice is given to the Company pursuant to THE COVERAGE 3. Discovery Clause, or if a claim is settled or withdrawn prior to judgment, award or verdict, or if a judgment, award or verdict is rendered generally and without regard to the relative culpability of those against whom it is rendered, the settlement sum shall be apportioned, in equal shares against (a) the remaining aggregate limits of liability available under COVERAGE B and (b) the remaining aggregate limits of liability available under COVERAGE A to each COVERAGE A Insured against whom such claim has been made individually, until each applicable aggregate limit of liability has been exhausted.

(ii)    In the event that subparagraph (i) does not apply and judgment, award or verdict is rendered, the judgement, award or verdict shall be apportioned, in such shares as those shares relate to the judgment, award or verdict in the manner of its rendition against each Insured against (a) the remaining aggregate limits of liability available under COVERAGE B and (b) the remaining aggregate limits of liability available under COVERAGE A to each COVERAGE A Insured against whom such judgment, award or verdict has been rendered individually, until each applicable aggregate limit of liability has been exhausted.

**2.**     **DEDUCTIBLE:** The deductible applicable under this policy shall be set forth as indicated in Item 7. of the Declarations.

The deductible shall be paid by the Named Insured and shall be applicable to each claim and to each notice given to the Company pursuant to THE COVERAGE 3. Discovery Clause, and shall apply to damages only, and not to claim expenses.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each claim shall not exceed the deductible amount stated in Item 7. of the Declarations.

**3.**     **LIMIT OF LIABILITY – REDUCTION FOR REFUSAL TO SETTLE:** The Company shall not settle any claim without the consent of the Insured. If the Insured is an association, corporation or partnership, the written consent of an Insured who was formerly but is no longer a member of the association, stockholder of the corporation, or partner of the partnership will not be required; provided the written consent of the remaining Insureds or their duly authorized representatives has been obtained. If, however, the Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the claim or continue any legal proceedings in connection with such claim, then the Company's liability for the claim shall not exceed the amount for which the claim could have been so settled plus claim expenses incurred up to the date of such refusal. Such amounts are subject to the provisions of section LIMITS OF LIABILITY 1.

**4.**     **PAYMENT OF CLAIM EXPENSES:** The Company shall pay in addition to the applicable limits of liability, all claim expenses. The determination of the Company as to the reasonableness of the claim expenses shall be conclusive on the Insured.

Claim expenses means whenever used in this policy:

(a)    fees charged by any lawyer designated by the Company;

(b)    all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a claim, if incurred by the Company;

(c)   fees charged by any lawyer designated by the Insured with the written consent of the Company.

However, "claim expenses" does not include salary charges of regular employees or officials of the Company or of any supervisory counsel retained by the Company.

5.   **MULTIPLE INSUREDS, CLAIMS AND CLAIMANTS:**

(a)   The inclusion herein of more than one Insured or one Insured in multiple capacities or the making of claims or the bringing of suits by more than one person or organization shall not operate to increase any liability of the Company. Two or more claims arising out of a single Malpractice or Personal Injury or a series of related Malpractices or Personal Injuries shall be treated as a single claim. All such claims, whenever made, shall be considered first made on the date on which the earliest claim arising out of such Malpractice or Personal Injury was first made, and all such claims shall be subject to the same limits of liability of the Company.

(b)   Subject to sections LIMITS OF LIABILITY 1(a), 1(b) and 1(c) above, and regardless of the number of claims made, or the number of claimants or the number of Insureds hereunder, two or more claims made during the policy period including any OPTIONAL EXTENSION PERIOD, if purchased, against any one Insured arising out of injuries sustained by any one patient or person as a result of Malpractice or Personal Injury shall constitute a single claim and the liability of the Company shall not exceed the amount stated in Item 6.(e) of the Declarations.

(c)   Subject to sections LIMITS OF LIABILITY 1(a) and 1(b) above, and regardless of the number of claims made, or the number of claimants or the number of Insureds hereunder, if one or more claims are first made during the policy period, including any OPTIONAL EXTENSION PERIOD, if purchased, against two or more Insureds arising out of injuries sustained by one patient or person as a result of Malpractice or Personal Injury shall constitute a single claim and the liability of the Company shall not exceed the amount stated in Item 6.(e) of the Declarations.

(d)   In the event that a claim is first made during the policy period, including any OPTIONAL EXTENSION PERIOD, if purchased, against an individual in both capacities as described in COVERAGE A and COVERAGE B, a single limit of liability shall apply and, in the event that those limits are not of equal amounts, that limit shall be the greater of the amount stated in Item 6.(a) or 6.(c) of the Declarations.

## CLAIMS

1.   **Notice of Claim or Suit:** As a condition precedent to his right to the protection afforded by this insurance, the Insured shall, as soon as practicable, give to the Company written notice directed to SHAND MORAHAN & COMPANY, INC., Ten Parkway North, Deerfield, Illinois 60015.

In the event suit is brought against the Insured, the Insured shall IMMEDIATELY forward to the Company through SHAND MORAHAN & COMPANY, INC. every demand, notice, summons or other process received by him or by his representatives.

2.   **Assistance and Cooperation of the Insured:** The Insured shall cooperate with the Company and upon the Company's request shall submit to examination and interrogation by a representative of the Company, under oath if required, and shall attend hearings, depositions and trials and shall assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits, as well as in the giving of a written statement or statements to the Company's representatives and meeting with such representatives for the purpose of investigation and/or defense, all without charge to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment which the Insured may have. The Insured shall not, except at his own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense without the written consent of the Company.

3. **Subrogation:** In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after the claim to prejudice such rights.

The Company shall not exercise any such rights against any persons, firms or corporations included in the definition of "Insured". Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against all Insureds in respect of any claim brought about or contributed to by the intentional, dishonest, fraudulent, criminal or malicious acts or omissions of such Insureds.

Any amount so recovered shall be apportioned as follows:

Any recovery shall first be used for the repayment of expenses incurred toward subrogation; second, to any loss and expense payment by the Insured in excess of any deductible(s); third, to any loss and expense payments by any excess carrier on behalf of the Insured; fourth, to any loss and expense payment by any primary carrier on behalf of the Insured; and, last, to the repayment of the Insured's deductible.

4. **Action Against the Company:** No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been fully and finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against the Insured to determine the Insured's liability. Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

5. **False or Fraudulent Claims:** If any Insured shall commit fraud in proffering any claim as regards amount or otherwise, this insurance shall become void as to such Insured from the date such fraudulent claim is proffered.

## OTHER CONDITIONS

1. **Application:** By acceptance of this policy, the Insured agrees that the statements in the application are his representations, that they shall be deemed material and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company, or any of its agents, relating to the insurance.

2. **Changes:** Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of the policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

3. **Assignment:** Assignment of interest under this policy shall not bind the Company unless its consent is endorsed hereon.

4. **Cancellation:** This policy may be canceled by the Named Insured by surrender thereof to the Company or to Shand Morahan & Company, Inc., Ten Parkway North, Deerfield, Illinois 60015 or by mailing to the aforementioned written notice stating when thereafter such cancellation shall be effective. If canceled by the Insured, the Company shall retain the customary short rate proportion of the premium.

This policy may be canceled by the Company or by Shand Morahan & Company, Inc., by mailing to the Named Insured at the address stated in the Declarations written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However, if the Company cancels the policy because the Insured has failed to pay a premium or deductible when due, this policy may be canceled by the Company by mailing a written notice of cancellation to the Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice by the Named Insured, the Company, or Shand Morahan & Company, Inc. shall be equivalent to mailing. If canceled by the Company or Shand Morahan & Company, Inc., earned

premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

5. **Inspection and Audit:** The Company shall be permitted but not obligated to inspect the Insured's operations at any time. Neither the Company's right to make inspections, nor the making thereof, nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the Insured or others, to determine or warrant that such operations are safe or healthful, or are in compliance with any law, rule or regulation.

The Company may examine and audit the Insured's books and records at any time during the policy period and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy.

6. **Authorization:** By acceptance of this Policy, the Named Insured agrees to act on behalf of all Insureds with respect to the giving of all notice to the Company as provided herein, the cancellation of this policy, the receiving of any return premium that may become due and the giving of notice to any Insured of any addition or deletion from coverage under this policy; and all Insureds agree that the Named Insured shall act on their behalf.

7. **Service of Suit:** For policies issued by a non-admitted insurer, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon General Counsel, Legal Department, Shand Morahan & Company, Inc., Ten Parkway North, Deerfield, Illinois 60015 and that in any suit instituted against the Company upon this contract, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## DEFINITIONS REFERENCE

Certain words are specifically defined for the policy and the definitions are to be found in the sections set forth below:

Claim, Personal Injury, Policy Period see The Coverage

Claim Expenses see Limits of Liability

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and Secretary, but this policy shall not be valid unless countersigned on the Declarations page by a duly authorized representative of the Company.

_Edgar W Phoebe_
Secretary

_Michael A. Rozenberg_
President

# NUCLEAR ENERGY LIABILITY
# EXCLUSION ENDORSEMENT (BROAD FORM)

This endorsement modifies the provisions of this policy.

It is agreed that:

1.    This policy does not apply:

    A.    Under any Liability Coverage, to bodily injury or property damage

        (1)    with respect to which an Insured under this policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (2)    resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B.    Under any Medical Payments Coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

    C.    Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

        (1)    the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an Insured or (b) has been discharged or dispersed therefrom;

        (2)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

        (3)    the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

2.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a)     any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.



○ DEERFIELD INSURANCE COMPANY
○ EVANSTON INSURANCE COMPANY
○ ESSEX INSURANCE COMPANY
○ MARKEL AMERICAN INSURANCE COMPANY
○ MARKEL INSURANCE COMPANY

## APPLICATION FOR PHYSICIANS & SURGEONS PROFESSIONAL LIABILITY INSURANCE

NOTICE: The policy for which application is made provides coverage on a "CLAIMS MADE" basis. Please read the policy carefully.

If space is insufficient to answer any question fully, attach a separate sheet.

**I. GENERAL INFORMATION**

1. (a) (i) Full name of Applicant: _Daniel H. Smith, MD_
   (ii) Professional Degree: _M.D._
   (b) Principal practice address: _20 Prospect Ave Suite 703   Bergen_
   (Street)                                                    (County)
   _Hackensack_          _NJ_          _07601_
   (City)                (State)        (Zip)
   (c) Secondary practice locations: _____

   (d) (i) Phone: _201-991-5373_   (ii) Fax: _201-336-8949_
   (iii) E-Mail Address: _____   (iv) Website Address: _____
   (e) (i) Date of Birth (MM/DD/YYYY): _02/12/1946_   (ii) Place of Birth: _Cushing, OK_
   (e) (i) Social Security No.: _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_   (ii) Federal Tax ID Number: _22-3141761_

2. Are you a U.S. citizen?.................................................................................... [X] Yes [ ] No
   If no, what is your status in the U.S. and current citizenship? _____

3. (a) Type of practice: [ ] solo practitioner (unincorporated)   [ ] solo practitioner (incorporated)*
   [ ] professional corporation*                                   [ ] professional association*
   [ ] limited liability company*                                  [X] partnership*
   [ ] employee of _____                                  [ ] independent contractor of _____
   [ ] other _____
   * Specify name of entity: _Northern New Jersey Cancer Assoc_
   (b) Do you want coverage for the entity named item 3(a) above? .................................. [ ] Yes [X] No
   (c) Attach a copy of your letterhead.
   (d) If you practice other than as an employee, unincorporated solo practitioner or independent contractor, list the names of all physicians practicing under the entity name in item 3(a) above.
   _See attachment_
   _____

4. Do you practice with any physician not named in item 3.(d) above? .................................. [ ] Yes [X] No
   If Yes, provide the name of each physician and the practice relationship. _____

5. Are you currently in active military service? .................................................... [ ] Yes [X] No

6. Provide the following information...or all of the states in which you practice:

| State | License No. | Effective Date | Expiration Date | Active (Yes/No) |
|-------|-------------|----------------|-----------------|-----------------|
| NJ | MA 057201 | 6/06/03 | 8/30/05 | Yes |
| NY | 146038-1 | | 1/31/06 | Yes |

7. Federal DEA License No. and status: AS 1453567

8. Provide the following information for all hospitals and surgi-centers where you are currently on staff:

| Name | City | State | Percentage of Work | Type of Privileges |
|------|------|-------|--------------------|--------------------|
| Hackensack Medical Center | Hackensack | NJ | 100 | admitting |

9. Are you currently a hospital chief of staff or head of any hospital department? [X] Yes [ ] No
   If Yes, describe. Division Chief Gynecologic Oncology, The Cancer Center

10. Do you or the entity firm named in item 3(a) above own (either wholly or in part), operate or administer any hospital, nursing home, surgicenter, urgent care center other facility where medical services are customarily provided? [ ] Yes [X] No
    If Yes, provide a detailed explanation specifically including the name, location, size, and number of beds.

## II. EDUCATION AND TRAINING

1. (a) Provide your medical or surgical specialty: Gynecologic oncology
   (b) Do you limit your practice to the specialty stated in item (a) above? [X] Yes [ ] No
   (c) Do you have a subspecialty? [ ] Yes [X] No
       If Yes, describe.

2. Are you American Board certified? [X] Yes [ ] No
   If Yes, provide the following: Medical specialty in which you are certified: Gynecologic oncology
   Date of certification: 1982    Any recertification date(s): 8/12/94
   If No, do you plan on taking the Board examination? [ ] Yes [ ] No

3. Provide the following information:

| | Name of Institution | City | State | Date Completed |
|--|---------------------|------|-------|----------------|
| Medical School PGY-1/Internship | Harvard Medical School | Boston | MA | 1973 |
| Residency – Specialty: gen surgery | Massachusetts General Hospital | Boston | MA | 1975 |
| Residency – Specialty: OB/GYN | USC medical center | Los Angeles | CA | 1978 |
| Fellowship – Specialty: GYN oncology | Memorial Sloan Kettering | New York | NY | 1981 |
| Other: | | | | |

4. If you graduated from a foreign medical school, are you certified by the Educational Council for Medical School Graduates? [ ] Yes [ ] No
   If Yes, provide the following: year of certification: _____ describe your medical degree: _____

5. Provide a detailed summary of ___ re you have practiced your profession si ___ completing your training:

_1982 - 87 Memorial Sloan Kettering    1982 - 5/83_

_Columbia Presbyterian 5/83 - present & Northern NJ Cancer Asso_

6. Are you a member of any professional societies? _Am A_ Society of Memorial S4N [ ] Yes [ ] No
   If Yes, provide information regarding your membership(s),

7. How many hours of continuing medical education have you take within each of the last two (2) years? _100_

## III. SCOPE OF PRACTICE

1. (a) Do you perform surgery, other than incision of boils & superficial abscesses or suturing skin & superficial fascia? ............................................................................................ [ ] Yes [ ] No
   If Yes, complete 1.(b) below.

   (b) If you perform any of the following procedures, check all that apply. For each procedure performed indicate where the procedure is performed: H = Hospital  O = Office  S = Surgi-center of other

| Procedure | Location | | Procedure | Location |
|---|---|---|---|---|
| Abortions - 1st Trimester | | | Hysterectomies | H |
| Abortions - 2nd/3rd Trimester | | | Laser skin resurfacing | |
| Acupuncture | | | Laser Surgery (describe) _Vagina_ | H |
| Adenoidectomy/Tonsillectomy | | | Lymphangiography | |
| Anesthesia – Non-obstetrical: | | | Minimally invasive surgery (describe) | H |
| General | | | _Tuboaros surgery salpingoophorectomy_ | |
| Spinal | | | Moh's micrographic surgery | |
| Epidural | | | Myelography | |
| Anesthesia – Obstetrical: | | | Needle biopsies (describe) _grain_ | |
| General | | | Obstetrics: _Abdomen, Vagina_ | |
| Spinal | | | Prenatal care | |
| Epidural | | | Normal deliveries - annual no. | |
| Anesthesia – Other (describe) | | | Caesarean sections - annual no. | |
| Angiography | | | VBAC deliveries – annual no. | |
| Angioplasty | | | Open Reduction of Fractures | |
| Anti-aging procedures – other than use of human growth hormone (describe) | | | Pain Management (describe) | |
| Arteriography | | | Plastic – Cosmetic Procedures. | |
| Assisting in Surgery – on own patients or the patients of others | H | | Blepharoplasty | |
| Breast Implants | | | Collagen Injections | |
| Breast Reductions | | | Botox Injections | |
| Catheterization - other than umbilical cord, urethral or arterial line in a peripheral vessel | | | Liposuction under 3500 cc's volume | |
| | | | Liposuction 3500 cc's or more volume | |
| Cosmetic implantation or injection of silicone or other material | | | Phalloplasty or penile implant | |
| Cryosurgery - other than on benign or pre-malignant dermatological lesions | | | Rhinoplasty | |
| | | | Silicone implants | |
| | | | Silicone injections | |
| Chelation Therapy | | | Other plastic – cosmetic procedures (describe) | |
| Dermabrasion/Chemical Peels | | | Pneumoencephalography | |
| Dilation & Curettage | H | | Prolotherapy/proliferative therapy | |
| Discograms | | | Radiation Therapy | |
| Electroconvulsive Therapy | | | Radiopaque dye injections into blood vessels, lymphatics, sinus tracts or fistulae | |
| Endoscopic procedures | H | | Refractive surgery: LASIK, PRK, AK, PTK, ICR | |
| Hair Transplants or Suturing of Hairpieces | | | Spinal surgery (incl chemonucleolysis or percutaneous, lumbar discectomy) | |
| Hyperbaric Medicine | | | Trans Myocardial Laser procedures | |

2.  (i)  Do you perform surgery for obesity?.................................................................................................... [ ] Yes [X] No
        If Yes, complete 2.(b) below.

    (ii)  If you perform any of the following procedures, check all that apply and provide the number of procedures performed:
        Roux-en-Y:
        ___  Laparoscopic:
            No. performed in past 12 months: _____
            No. you expect to perform in next 12 months: _____
        ___  Open:
            No. performed in past 12 months: _____
            No. you expect to perform in next 12 months: _____
        Banding:
        ___  Laparoscopic:
            No. performed in past 12 months: _____
            No. you expect to perform in next 12 months: _____
        ___  Open:
            No. performed in past 12 months: _____
            No. you expect to perform in next 12 months: _____
        Gastric Restriction. Other (describe) _____
            No. performed in past 12 months: _____
            No. you expect to perform in next 12 months: _____

3.  Is general anesthesia administered for any of the procedures identified in 1.(b) or 2, above? .................. [X] Yes [ ] No
    If Yes, is anesthesia is administered by:
    (a)  you?.................................................................................................................................................. [X] Yes [ ] No
    (b)  an Anesthesiologist?........................................................................................................................ [ ] Yes [X] No
    (c)  a Certified Registered Nurse Anesthetist (CRNA)?.......................................................................... [X] Yes [ ] No
        If Yes, is the CRNA directed by or responsible to an Anesthesiologist?........................................ [X] Yes [ ] No
        If No, explain the type of surgery and percentage of your surgeries or average number of such cases per month.
        _____

    (d)  Are Harvard Standards for the administration of all anesthesia adhered to?...................................... [X] Yes [ ] No

4.  (a)  Do you perform any surgery in your office? .................................................................................. [X] Yes [ ] No
        If Yes, answer the following:                                                                                                        [ ] Yes [ ] No
        (i)  Describe each procedure not already identified above in 1(b) or 2 above: Biopsies Cervix
            uterus, Vagina, vulva
        (ii)  Is your surgical suite certified?.................................................................................................... [ ] Yes [X] No
            If Yes, provide the name of the certification body. _____

    (b)  Do you perform any surgery in other non-hospital facilities?............................................................ [ ] Yes [X] No
        If Yes, answer the following:
        (i)  Describe each procedure not already identified above in 1(b) or 2 above: _____
        (ii)  Name each facility: _____

5.  With the exception of surgery for obesity, does your practice include weight reduction or control by other than diet or exercise?............................................................................................................................ [ ] Yes [X] No
    If Yes, answer the following:
    (a)  Percentage of your patients that are weight control patients: _____
    (b)  Do you dispense any drugs?.......................................................................................................... [ ] Yes [ ] No
        If Yes, provide the name(s) of the drug(s) dispensed. _____

(c) Do you use injections for weight control? _____ [ ] Yes [ ] No
If Yes, provide the name(s) of the drugs injected. _____

6. Do you perform any hospital emergency room care? _____ [ ] Yes [ ] No
If Yes, is this solely a requirement for active admitting privileges? _____ [ ] Yes [ ] No
If No, provide a detailed description including the approximate number of hours per month spent in emergency room care _____ [ ] Yes [ ] No
_consultation only_

7. Do you perform consultations outside the state of your primary office address, including but not limited to the use of telecommunications technology as the medium for rendering medical opinions or medical advice (telemedicine or internet medicine)? _____ [ ] Yes [X] No
If Yes, provide the following:
(a) Identify all states in which such patients reside: _____
(b) What percentage of your total practice is involved in such activities? _____

8. Do you read, interpret or diagnose films, slides or specimens taken from patients residing in states other than your primary practice address? _____ [ ] Yes [X] No
If Yes, identify all states in which such patients reside. _____

9. (a) Do you use experimental procedures, devices, drugs or therapy in treatment or surgery? [X] Yes [ ] No
If Yes, do you follow FDA-approved protocols? _____ [X] Yes [ ] No
If Yes, describe _____IRB approved_____
(b) Are you a Principal Investigator for any clinical trial? _____ [ ] Yes [X] No

10. (a) Indicate the number of professional employees in your practice for each of the following: (If none, check here [X] )

____ Physicians other than yourself   ____ Podiatrists         ____ Chiropractors        ____ Optometrists
____ Physician's Assistants*          ____ Nurses              ____ Nurse Practitioners*  ____ Nurse Anesthetists*
____ Surgeon's Assistants*            ____ Nurse Midwives*     ____ Psychologists
____ Other (describe) _____

*Provide a description of duties, in detail, including extent supervised on a separate page and attach protocols.

(b) Are all of the above individuals licensed in accordance with applicable state and federal regulations? _____ [ ] Yes [ ] No
If No, provide a detailed explanation on a separate page.

11. (a) Average weekly patient load: __50__   (b) Number of patients annually: __2500__
12. Average number of hours you practice each week: _____
13. What is your approximate gross annual income from your practice? (Check one.)
____ Less than $50,000
____ $100,000 to $149,999          ____ $50,000 to $99,999
____ $200,000 to $499,999          ____ $150,000 to $199,999
                                   ____ $500,000 or more (estimate) $_____

14. Do you supervise anyone other than your own employees? _____ [ ] Yes [X] No
If Yes, indicate by profession the number of individuals you supervise:

____ Physicians other than yourself  ____ Podiatrists          ____ Chiropractors
____ Physician's Assistants          ____ Nurses               ____ Nurse Practitioners   ____ Optometrists
____ Surgeon's Assistants            ____ Nurse Midwives       ____ Psychologists         ____ Nurse Anesthetists
____ Radiology Technicians           ____ Laboratory Technicians                           ____ Other (describe) _____

Provide a detailed explanation of the responsibilities for each profession and your relationship to the entity that employs these individuals. _____

15. List your prior Professional Jab. Insurance for each of the last five (5) years, including the current year:

| Ins Company | Limits of Liability | Premium | Eff./Exp. Dates | Claims Made or Occurrence Form | Retroactive Date |
|---|---|---|---|---|---|
| Evanston Ins | $1/m / $3m | $66.00 | 5/09 | 5/1/04-5 | Claims made 5/1/03 |
| MCIC | $5m / $3,500,000 | | 1/1/03-04 | claims made | |

16. Do you currently participate in any state patient compensation fund, health care stabilization fund or other governmentally established malpractice liability funding mechanism? ............................................ [ ] Yes [X] No

17. Do you anticipate any changes in your practice in the next year? ....................................................... [ ] Yes [X] No
If Yes, attach a detailed explanation.

## IV. AFFILIATIONS

1. Are you in the employ of any individual, firm or corporation other than the employer named in Section I. 3(a) above? ...................................................................................................
If Yes, provide a detailed explanation including a description of your responsibilities. ................... [ ] Yes [X] No

2. Are you under contract to any individual, firm or corporation other than the contracting entity named in Section I. 3(a) above? ................................................................................................
If Yes, provide a detailed explanation including a description of your responsibilities. ................. [ ] Yes [X] No

If Yes, does any contract contain a hold harmless agreement? ......................................................
If Yes, attach a copy of the contract. ............................................................................... [ ] Yes [ ] No

3. Are you in the employ of or under contract to any governmental entity? ....................................
If Yes, provide a detailed explanation including a description of your responsibilities. ............... [ ] Yes [X] No

4. Do you advertise your professional services in any manner other than a simple listing in a telephone directory? ..........................................................................................................
If Yes, attach a copy of all advertisements. ........................................................................ [ ] Yes [X] No

5. Are you associated with any agency or organization that engages in advertising for, or solicitation of patients? ...............................................................................................................
If Yes, attach a copy of the advertisement or applicable website address. ............................... [ ] Yes [X] No

6. Are you the Medical Director of a nursing home, clinic, commercial enterprise or any other organization? .............................................................................................................
If Yes, provide a detailed explanation and attach a copy of any contract or other agreement that describes your position. ................................................................................................................ [ ] Yes [X] No

7. Do you have any administrative or teaching responsibilities? ......................................................
If Yes, provide the following and attach a copy of any contract or agreement: ........................... [ ] Yes [X] No
(a) Name of entity and location: _____
Your title _____
(b) Does the entity provide you coverage for:
(i) Your administrative responsibilities? ........................................................... [ ] Yes [ ] No
(ii) Your direct patient care? ......................................................................... [ ] Yes [ ] No

8. Do you work for any locum tenens companies? ............................................... [ ] Yes [X] No
   If Yes, provide the following :

   (a) Name of each company that places you in locum positions: _____

   (b) Are you an [ ] Employee or [ ] Independent Contractor?

   (c) Number of hours each month in which you work in locum positions: _____

   (d) Does each company provide you with Professional Liability Insurance for locum positions? ........ [ ] Yes [ ] No
       If Yes, attach a copy of your Certificates of Insurance.

9. Do you provide any services to any adult or juvenile inmates in any local, state or federal
   correctional facility, jail, prison, holding facility or other location?
   If Yes, provide details. .................................................................................. [ ] Yes [X] No

10. Are you engaged in or planning to engage in any "moonlighting" activities? ............................. [ ] Yes [X] No
    If Yes, do you want coverage for your "moonlighting" activities? ...................................... [ ] Yes [ ] No
    If Yes, describe the activities _____ [ ] Yes [ ] No

## V. CLAIMS AND HISTORY

1. Has any claim or suit for malpractice ever been made against you or any entity proposed for this
   insurance?   *None since last response - See old sheet*
   If Yes, how many? _____ Complete a Shand Morahan & Company, Inc. Supplemental Claim form for each one.

2. Has any claim or suit for malpractice ever been made against you or any entity proposed for this
   insurance that has not been reported to the current insurer or any prior insurer? ....................... [ ] Yes [X] No
   If Yes, how many? _____ Complete a Shand Morahan & Company, Inc. Supplemental Claim form for each one.

3. Are you or any entity proposed for this insurance aware of any act, error, omission, fact,
   circumstance, or records request from any attorney which may result in a malpractice claim or suit? . [ ] Yes [X] No
   If Yes, how many? _____ Completed a Shand Morahan & Company, Inc. Supplemental Claim form for each one.

4. Have you ever been investigated, asked to resign or been involved in official or non-official
   proceedings brought by a hospital, managed care organization or other healthcare organization to
   deny, limit, suspend, non-renew or revoke your privileges? ............................................... [ ] Yes [X] No

5. Has your license to practice medicine or your permit to prescribe or dispense drugs ever been
   limited, suspended, revoked, placed on probation or been voluntarily surrendered in any state? ......... [ ] Yes [X] No

6. Have you ever been notified to respond to, appear before or have you ever been investigated by any
   licensing or regulatory agency on a complaint of any nature, including but not limited to
   unprofessional or unethical conduct? ..................................................................... [ ] Yes [X] No

7. Have you ever been charged with or convicted of an act committed in violation of any law or ordinance? .. [ ] Yes [X] No

8. Have you ever been evaluated, treated or hospitalized for alcohol or substance abuse or mental or
   emotional disorders? ..................................................................................... [ ] Yes [X] No

9. Have you ever had or do you now have a physical or mental disability or other condition or
   circumstance that, despite reasonable accommodation, would limit your ability to safely practice in
   your medical specialty? .................................................................................. [ ] Yes [X] No

**Note:** If the Applicant does not purchase prior acts coverage from the Company there will be no coverage with
the Company for any claim, suit or circumstances based upon the rendering or failure to render
professional services prior to the effective date of the Applicant's policy, if issued.

## NOTICE TO THE APPLICANT - PLEASE READ CAREFULLY

The policy applied for is SOLELY AS STATED IN THE POLICY, if issued, which provides coverage on a "CLAIMS MADE"
basis to ONLY THOSE "CLAIMS" THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD,
unless the Optional Extension Period option is exercised in accordance with the terms of the policy.

Shand Morahan & Company, Inc. or the Company is authorized to make any inquiry in connection with this application.
Signing this application does not bind the Company to provide or the Applicant to purchase the insurance.

This application, information submitted with this application and all previous applications and material changes thereto of
which Shand Morahan & Company, Inc. receives notice is on file with Shand Morahan & Company, Inc. and is considered

physically attached to and part of the of the policy if issued, Shand Morahan & Company, Inc. and the Company will have relied upon this application and all such attachments in issuing the policy. If the information in this application or any attachment materially changes between the date this application is signed and the effective date of the policy, the Applicant will promptly notify Shand Morahan & Company, Inc., who may modify or withdraw any outstanding quotation or agreement to bind coverage.

### WARRANTY

I warrant to the Company, that I understand and accept the notice stated above and that the information contained herein is true and that it shall be the basis of the policy and deemed incorporated therein, should the Company evidence its acceptance of this application by issuance of a policy. I authorize the release of claim information from any prior insurer to Shand Morahan & Company, Inc. or the Company, Ten Parkway North, Deerfield, Illinois 60016.

Must be signed by the Applicant within 60 days of the proposed effective date.

Name of Applicant _Daniel H. Smith, MD_

Signature of Applicant

Title _Division Chief, Gynecology Oncology_

Date _3/20/05_

Notice to Applicants: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.

### ADDITIONAL EXPLANATIONS

**SHAND MORAHAN & COMPANY, INC.**
Ten Parkway North, Deerfield, IL 60015
(847) 572-6010 Fax (847) 572-6137
Underwriting Manager
A Markel Company

- DEERFIELD INSURANCE COMPANY
- EVANSTON INSURANCE COMPANY
- ESSEX INSURANCE COMPANY
- MARKEL AMERICAN INSURANCE COMPANY
- MARKEL INSURANCE COMPANY

## MEDICAL INCIDENT OR THREAT OF CLAIM FORM
## FOR PHYSICIAN, SURGEON, DENTIST & PODIATRIST APPLICATIONS

**APPLICANT'S INSTRUCTIONS:**
1. Answer all questions. If the answer requires detail, please attach a separate sheet.
2. This is a mandatory form which must accompany a completed application.
3. PLEASE READ THE STATEMENTS AT THE END OF THIS APPLICATION CAREFULLY.
(PLEASE TYPE OR PRINT IN INK)

**1. NAME OF APPLICANT**

Daniel H. Sm, H, mD

**2. APPLICANT HISTORY**

a. Are you aware of any act, error, omission or circumstance which could result in a malpractice claim or suit being made against you? .......................................................................... [ ] Yes [✓] No
If Yes, has this been reported to a prior carrier? ................................................................. [ ] Yes [ ] No
SUPPLEMENTAL CLAIM INFORMATION form SM6236 is required for each such medical incident or threat of claim: have you attached the completed form? ........................................ [ ] Yes [ ] No

b. To the best of your knowledge, have any of the following adverse results occurred in your practice in the last (5) years:
   (i) Unexpected death (including stillbirths)? ...................................................................... [ ] Yes [✓] No
   (ii) Unexpected organ failure or significant neurological or functional deficit? .................. [ ] Yes [✓] No
   (iii) Failure to diagnose cancer or infection resulting in death or disability of patient? ........ [ ] Yes [✓] No
   (iv) Tear or perforation of an organ or body part during an invasive procedure, or unplanned removal of a normal organ or body part during an operative procedure? ............................ [ ] Yes [✓] No
   (v) Suspicious or positive x-ray, Pap smear or mammogram where patient was not contacted? ...... [ ] Yes [✓] No
   (vi) Follow-up/emergency surgery, myocardial infarction or cerebral vascular accident within 48 hours of your previous diagnostic treatment or surgery? .................................................. [ ] Yes [✓] No
   (vii) Complications from improper medication or improper dosage? .................................. [ ] Yes [✓] No
   (viii) Pathological and/or operative report which do not match? ....................................... [ ] Yes [✓] No
If yes to any of the above, has it been reported to a prior carrier? .......................................... [ ] Yes [✓] No
If you have NOT reported to a prior carrier, please attach an explanation.
SUPPLEMENTAL CLAIM INFORMATION form SM6236 is required for each such adverse result: have you attached the completed form? ............................................................... [ ] Yes [ ] No

c. Has any attorney contacted you (e.g., request for medical records) in connection with any patient that has NOT been disclosed to us? ....................................................................................... [ ] Yes [ ] No
If yes, SUPPLEMENTAL CLAIM INFORMATION form SM6236 is required for each such adverse result: have you attached the completed form? ......................................................... [ ] Yes [ ] No

d. Does your current professional liability carrier require reporting of an incident or request for records by a patient or attorney? ........................................................................................................ [ ] Yes [ ] No

e. Has any prior professional liability carrier refused coverage for, or declined to accept your report, of a medical incident, threat of claim, adverse result or attorney contact? ..................... [ ] Yes [ ] No
If yes, please attach an explanation.

I understand information submitted herein becomes a part of my Professional Liability Application and is subject to the same warranty and conditions.

Name of Applicant  Daniel H. Smith          Title  mD

Signature of Applicant  _Daniel H. Sm___          Date  3/28/05

*Signing this form does not bind the applicant or the Company or the Underwriting Manager to complete the insurance.

SM 6245-02 (01/02)

**SHAND MORAHAN**
MANAGER & COMPANY, INC.
Ten Parkway North, Deerfield, IL 60015
(847) 572-6000 Fax (847) 572-6177
Underwriting Manager
A Markel Company

○ DEERFIELD INSURANCE COMPANY
○ EVANSTON INSURANCE COMPANY
○ ESSEX INSURANCE COMPANY
○ MARKEL AMERICAN INSURANCE COMPANY
○ MARKEL INSURANCE COMPANY

## MEDICAL INCIDENT FORM, PART II

This is to certify that to the best of my knowledge I am unaware of any of the following adverse results/circumstances occurring in my practice in the last (5) years.

1. Death, unexpected or unexplained

2. Paralysis, paraplegia, quadraplegia

3. Spinal cord injury

4. Brain damage

5. Total or partial loss of limb, or loss of the use of limb

6. Sensory organ or reproductive organ impairment

7. Disability or disfigurement

8. Any assertion by a patient that he/she has been medically injured

9. Any injury to a part of the anatomy not undergoing treatment

10. Misdiagnosis of a patient's condition resulting in substantially increased morbidity

11. Any assertion by the patient or family that no consent for treatment (medical or surgical) was given

12. Neurological deficit not present at admission or prior to surgery

13. Cardiac arrest unexpected

14. Suicide

15. Wrong patient, wrong site

16. Second or third degree burns inflicted during treatment

17. Hospital incurred trauma

18. Unplanned removal of an organ or part

19. Injury/death to either child or mother during delivery

20. Any birth when the baby is stillborn, expires shortly after delivery, or is transferred to an I.C.U.

21. Complicated delivery, poor outcome

22. APGAR less than 4 or requiring resuscitation

23. Any request for medical records from an attorney or notification of an intent to sue

24. Any request for copies of any patient's records by a patient or patient's attorney other than for a normal transfer of records.

Exception to the above (provide full details here)

_____
_____
_____
_____

I/We understand information submitted herein becomes a part of my/our employment practices liability application and is subject to the same representations and conditions.

Daniel H. Smith MD
Name of Applicant

Daniel H Smith
Signature of Applicant

Title (Officer, partner, etc.)

3/28/05
Date

The applicant agrees that the aforementioned statements are his/her representations, that they shall be deemed material and that any policy issued is done so in reliance upon the truth of such representations.

# EXHIBIT B



# MCIC
### VERMONT, INC.
##### A RISK RETENTION GROUP

**76 ST. PAUL STREET**
**SUITE 500**
**BURLINGTON, VERMONT, 05401**

These DECLARATIONS and the attached forms and Endorsements complete this

## PROFESSIONAL/COMMERCIAL GENERAL LIABILITY POLICY

Words and phrases that appear below in bold letters have the special meaning set forth in DEFINITIONS APPPLICABLE TO PARTS 1 AND 2.

Policy Number: PR 1106    Policy Period from January 1, 2006 to January 1, 2007 12:01 A.M. E.S.T.

| Named Insured | Address | Retroactive Date |
|---|---|---|
| The New York and Presbyterian Hospital | 525 East 68th Street<br>New York, New York 10021 | July 1, 1978 |
| University of Rochester | 601 Elmwood Avenue<br>Rochester, New York 14642 | July 1, 1978 |
| The Johns Hopkins University | Charles and 34th Streets<br>Baltimore, Maryland 21218 | July 1, 1978 |
| The Johns Hopkins Hospital | 600 N. Wolfe Street<br>Baltimore, Maryland 21287 | July 1, 1978 |
| Yale University | 333 Cedar Street<br>New Haven, Connecticut 06510 | July, 1 1979 |
| Yale-New Haven Hospital | 20 York Street<br>New Haven, Connecticut 06510 | July 1, 1979 |
| Cornell University | Weill Medical College of Cornell University<br>1300 York Avenue<br>New York, New York 10021 | July 1, 1993 |
| The Trustees of Columbia University in the City of New York. | 311 Low Memorial Library<br>Mailcode 4328<br>535 West 116th Street<br>New York<br>NY 10027 | July 1, 1978 |

The insurance afforded is with respect to the following coverages as indicated below.

| Coverage | Deposit Premium | Limits of Liability |
|---|---|---|
| Part 1 – Professional Liability | ▮▮▮▮▮▮▮ | See Endorsement No. 2 |
| Part 2 – Commercial General Liability including Personal and Advertising Injury | Included | See Endorsement No. 2 |

**LIMITS OF LIABILITY:** The limit of the Company's liability as shown is the total limit of liability for all coverages provided by this policy regardless of the number of Insureds, Claims or claimants, subject to all the terms of this policy having reference thereto.

**CLAIMS MADE POLICY:** Coverage applies to liability arising from **Medical Incidents, Managed Care Incidents** or **Events** occurring subsequent to the **Insured's Retroactive Date** and while coverage is in force for the **Insured** provided that any **Claim** must be first made against the **Insured** during the policy period. Please review this policy carefully.

Countersigned by: _____
**Authorized Representative**

**NOTICE:** This policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your State. State insurance insolvency guaranty funds are not available for your risk retention group.

MCIC Vermont, Inc. (A Risk Retention Group) (hereinafter called the "Company") in consideration of the payment of premiums, in reliance upon the statements in the Declarations made a part hereof and subject to the limits of liability, exclusions, conditions and other terms of this policy agrees with the Named Insureds named in the Declarations as follows:

## PART 1 - PROFESSIONAL LIABILITY

I.      **INSURING AGREEMENT:**

To pay on behalf of the Insured all sums which the Insured shall be legally obligated to pay as **Damages** because of any **Claim** or **Claims** first made against the **Insured** during the period this insurance is in force arising out of a **Medical Incident** or a **Managed Care Incident** occurring within the **Policy Territory** subsequent to the **Insured's Retroactive Date** and before the earliest of (a) the expiration or termination of this policy, (b) the **Insured's** termination of employment or association with a **Named Insured** or an **Endorsement No. 1 Insured**, or (c) the **Insured's** voluntary election not to be provided coverage by this policy.

II.     **EXCLUSIONS:**

This insurance under Part 1 does not apply:

A.      to **Bodily Injury, Personal and Advertising Injury**, or **Property Damage** which is directly caused by the happening of one or more of the following:

1.      fire or lightning;

2.      windstorm or hail;

3.      explosion;

4.      riot, riot attending a strike or civil commotion;

5.      **Events** involving an **Aircraft** or **Automobile**;

6.      sonic shock waves;

7.      smoke;

8.      vandalism or malicious mischief;

9.      sprinkler leakage;

10.     **Elevator** malfunction;

11.     earthquake or flood;

12.     structural collapse of a building or part of a building; or

13.     food or beverage poisoning;

B.      to any obligation which the **Insured** or any carrier as insurer may be held liable under any Workers' Compensation, Unemployment Compensation, or Disability Benefit Law or under any similar law;

C.      to liability of the **Insured** directly or indirectly based upon, arising out of, or resulting from war whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution;

D.      to any **Physician, Dentist** or other licensee whose professional license or right or privilege to practice his or her profession in any appropriate jurisdiction is suspended or revoked by a legally constituted and authorized body;

E.      to **Damages** incurred due to a **Claim** directly or indirectly based upon, arising out of, or resulting from the actual or alleged willful violation of a law, statute, ordinance or regulation committed by or with the knowledge or consent of an **Insured** in the course of rendering **Managed Care Professional Services**; however, the violation of one **Insured** will not be imputed to any other **Insured** who was not aware of and did not participate in the violation;

F.      to **Damages** incurred due to a **Claim** directly or indirectly based upon, arising out of, or resulting from actual or alleged criminal, deliberately dishonest or fraudulent acts, errors or omissions committed by or at the direction of an **Insured** in the course of rendering **Managed Care Professional Services**; however, such acts, errors or omissions of one **Insured** will not be imputed to any other **Insured** who was not aware of and did not participate in the violation;

G. to any payment obligations assumed by the **Insured** as a carrier, insurer, reinsurer or third party payor, such as a payor under a health care plan or health insurance policy;

H. to any **Claim** directly or indirectly based upon, arising out of, or resulting from the actual or alleged violation of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any state Blue Sky or securities law or similar state or federal statute and any regulation or order issued pursuant to any of the foregoing statutes, or any actual or alleged violation of the Racketeer Influence and Corrupt Organizations Act, 18 USC Section 1961 et seq, and any amendments, or any rules or regulations promulgated thereunder;

I. to any action or proceeding brought by or on behalf of any federal, state or local government regulatory agency or administrative agency, whether such action or proceeding is brought in the name of such agency, or by or on behalf of such agency in the name of another individual or entity, specifically including, but not limited to, any healthcare fraud or abuse proceeding alleging violations of the False Claim Act, 31 U.S.C. Section 3729, et seq., the Health Insurance Portability and Accountability Act of 1996, the Social Security Act, 42 U.S.C. Section 1320a, et seq., and any amendments or any rules or regulations promulgated thereunder, or any similar federal, state or local law or regulation; however, notwithstanding this exclusion, the Company will pay **Administrative Event Legal Fees** incurred by or on behalf of:

    1. a **Named Insured, Endorsement No. 1 Insured** or any **Physician, Dentist** or other professional who is an **Insured** in defending an **Administrative Event**, except as respects any administrative or judicial proceeding instituted by a government agency directly or indirectly based upon, arising out of or resulting from the Health Insurance Portability and Accountability Act of 1996, as amended; or

    2. any **Physician, Dentist,** other professional who is an **Insured** or an employee of a **Named Insured** or **Endorsement No. 1 Insured** in defending an **Administrative Event,** but only as respects any administrative or judicial proceeding instituted by a government agency directly or indirectly based upon, arising out of or resulting from the Health Insurance Portability and Accountability Act of 1996, as amended.

All payments made under the exception to this exclusion for the **Administrative Event Legal Fees** of **Insureds** other than the **Named Insured** or an **Endorsement No. 1 Insured** shall be subject to and reduce the **Administrative Event** sublimits of liability stated in **Endorsement No. 2;**

J. to any **Claim** directly or indirectly based upon, arising out of or resulting from any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or similar provisions by any federal, state or local statute or common law, or any amendments thereto, or any rules or regulations promulgated thereunder; however, this exclusion only applies with respect to the **Insured's** sponsorship or administration of its own employee benefit plans;

K. to any liability of another person or entity which the **Insured** assumed under a written or oral agreement. This exclusion does not apply:

    1. to liability that the **Insured** would have in the absence of the contract or agreement;

    2. to liability as a result of an **Insured Physician's** or **Insured Dentist's** written agreement to indemnify or hold harmless a health maintenance organization or other managed care organization, but only to the extent such assumed liability arises from the negligence of such **Insured Physician** or **Insured Dentist** in rendering or failing to render **Professional Services** for such health maintenance organization or other managed care organization. The limit of liability will apply first to the **Insured Physician's** or **Insured Dentist's** own liability and secondly to the assumed vicarious liability of the health maintenance organization or other managed care organization; or

    3. to liability as a result of a **Named Insured's** or an **Endorsement No. 1 Insured's** written agreement to indemnify or hold harmless a third party, but only to the extent such assumed liability arises from an **Insured's** negligence in furnishing or failing to furnish **Professional Services** or **Managed Care Professional Services** pursuant to such written contract. The limit of liability will apply first to the **Named Insured's** or **Endorsement No. 1 Insured's** own liability and secondly to the assumed vicarious liability of the third party;

L. to any **Claim** by prospective, current or former employees of any **Insured** directly or indirectly based upon, arising out of or resulting from any **Employment Practices.** However, this exclusion will not apply to the extent such **Claims** concern:

    1. appointment, reappointment, accreditation, credentialing, privileging or peer review activities with regard to current, former or prospective **Physicians, Dentists** or allied health professional employees of a **Named Insured** or an **Endorsement No. 1 Insured** which constitute covered **Professional Services** as described in subparagraph (a)(v) of the **Professional Services** definition; or

2. appointment, reappointment, credentialing, privileging, selection or contracting activities which constitute **Managed Care Professional Services** performed with regard to current, former or prospective **Physicians, Dentists** or allied health professional employees a **Named Insured** or an **Endorsement No. 1 Insured;**

M. to any **Claim** directly or indirectly based upon, arising out of or resulting from asbestos, regardless of whether the asbestos is:

1. airborne as a fiber or particle;
2. contained in a product;
3. carried or transmitted on clothing or by any other means; or
4. contained in, or a part of, any building, any building material, any insulation product, or any component part of any building, building material or insulation product;

N. to any **Claim** directly or indirectly based upon, arising out of or resulting from any actual or alleged violation of any federal, state or local law proscribing antitrust, restraint of trade, unfair competition or price-fixing, or any rules or regulations promulgated thereunder; however, this exclusion will not apply to violations allegedly committed in the course of accreditation, credentialing, peer review, appointing, reappointing, privileging, selecting or contracting of healthcare professionals which activities are otherwise covered by this policy;

O. to any **Claim** directly or indirectly based upon, arising out of or resulting from any actual or alleged **Sexual Misconduct;** however, this exclusion will not apply to the **Named Insured** or to an **Endorsement No. 1 Insured** unless the **Named Insured** or **Endorsement No. 1 Insured** directed, ratified or knowingly permitted the **Sexual Misconduct.** Notwithstanding this exclusion, at the election of a **Named Insured,** the Company will defend any **Claim** against an individual **Insured** alleging **Sexual Misconduct;**

P. to **Damages** incurred in connection with any **Claim** directly or indirectly based upon, arising out of, or resulting from any **Medical Incident** or **Managed Care Incident** which:

1. underlies or is alleged in any legal, injunctive or administrative proceeding against an **Insured** brought prior to or pending on the effective date of the earliest Professional/General Liability policy covering the **Insured** issued by the Company and listed in Part 1, Section III.H which has been consistently renewed through this policy period;

2. which was the subject of any other policy of insurance or self-insurance program prior to the effective date of the earliest Professional/General Liability policy covering the **Insured** issued by the Company and listed in Part 1, Section III.H which has been consistently renewed through this policy period;

Q. to any **Claim** by or on behalf of one **Insured** against another **Insured** which **Claim** is directly or indirectly based upon, arising out of or resulting from a **Managed Care Incident;** however, this exclusion will not apply to the extent such **Claim** is:

1. brought by a healthcare provider which concerns otherwise covered appointment, reappointment, accreditation, credentialing, peer review, privileging, selection or contracting; or

2. maintained independently by a participant in an employee benefit plan administered by the **Insured** or by a patient of the **Insured;**

R. to any **Claim** directly or indirectly based upon, arising out of or resulting from the insolvency, receivership, bankruptcy, rehabilitation, liquidation or financial inability to pay of any **Insured,** insurer, benefit plan or other person or organization;

S. to any **Claim** directly or indirectly based upon, arising out of or resulting from the following:

1. the failure to obtain, implement, effect, comply with, provide notice under or maintain any insurance policy or program of insurance, medical expense, stop loss or provider excess coverage, reinsurance, self-insurance, suretyship or bond;

2. the commingling or mishandling of funds;

3. the failure to collect or pay premiums, commissions, brokerage charges, fees or taxes; or

4. the brokering or underwriting of insurance policies or risks;

T. to any **Claim** directly or indirectly based upon, arising out of or resulting from a **Managed Care Incident** to the extent it seeks: restitution, return, disgorgement, payment or recovery of fees, salary, capitation payments, bonuses, withholds, profits, premiums or other amounts wrongfully obtained, withheld or

owed; non-monetary relief; or amounts owed to any healthcare provider under any contract;

U.  to the extent that a Claim is:

    1.  made against a director (except a medical director), officer or trustee of a Named Insured or an Endorsement No. 1 Insured for acts, errors or omissions in his or her capacity as a director, officer or trustee of a Named Insured or an Endorsement No. 1 Insured; and

    2.  covered under the Insured's directors and officers liability insurance policy;

V.  to any Claim directly or indirectly based upon, arising out of or resulting from the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants at any time; or

W.  to any Claim for copyright, patent, trade name, trademark, trade dress or other infringement of intellectual property rights.

III.  **PERSONS INSURED:**

Each of the following is an Insured under Part 1 to the extent set forth below:

A.  each Named Insured, each Endorsement No. 1 Insured, and any executive officer, or member of the Board of Trustees, Managers, Directors, Governors or similar advisory or governing board, of a Named Insured or an Endorsement No. 1 Insured while acting within the scope of his or her duties as such;

B.  any employee or fellow, other than a Physician, Dentist, or medical or dental intern or resident of a Named Insured or an Endorsement No. 1 Insured, while acting within the scope of his or her professional duties as such;

C.  any licensed Physician or Dentist for whom a Named Insured has elected to provide coverage and who is either:

    1.  designated as an Insured Physician or Dentist with the Status Code "Full Time - Broad" or "Part Time - Broad" in the Company's Physician Exposure Management System by such Named Insured while acting within the scope of his or her professional responsibilities, or

    2.  designated as an Insured Physician or Dentist with the Status Code "Full Time - Limited" or "Part Time - Limited" in the Company's Physician Exposure Management System by such Named Insured while furnishing Professional Services within the limitations prescribed by such Named Insured;

D.  any medical or dental resident, intern or fellow for whom a Named Insured has elected to provide coverage and who is designated with the Insurance Category "Fellows - ACGME", "Fellows - Non ACGME, or "House Staff" in the Company's Physician Exposure Management System by such Named Insured while acting within the scope or course of his or her professional employment with a Named Insured or an Endorsement No. 1 Insured or a program of approved medical instruction by a Named Insured or an Endorsement No. 1 Insured;

E.  any employee of an Insured Physician or Dentist provided that:

    1.  If such employee is a **Ratable AHP**, such employee has been designated by a Named Insured in the Insurance Category AHP in the Company's Physician Exposure Management System, and

    2.  the Claim against such employee arises from a **Medical Incident or Managed Care Incident** occurring

        a.  while such employee is acting within the scope or course of his or her professional employment by such Physician or Dentist, and

        b.  in connection with such Physician or Dentist rendering Professional Services or Managed Care Professional Services;

F.  any professional corporation, trust or partnership formed for a medically related purpose for whom a Named Insured has elected to provide coverage and who is designated with the Insurance Category "Medical Organization" in the Company's Physician Exposure Management System by such Named Insured, and the employees of such professional corporation, trust or partnership provided that:

    1.  If such employee is a **Ratable AHP**, such employee has been designated by a Named Insured in the Insurance Category AHP in the Company's Physician Exposure Management System, and

    2.  the Claim against such employee arises from a **Medical Incident or Managed Care Incident**

occurring

    a.   while such employee is acting within the scope or course of his or her professional employment by such **Physician** or **Dentist**, and

    b.   in connection with such **Physician** or **Dentist** rendering **Professional Services** or **Managed Care Professional Services**;

G.   any student or volunteer associated with a **Named Insured** or an **Endorsement No. 1 Insured** while acting within the scope of his or her duties as such or a program of approved medical instruction by a **Named Insured** or an **Endorsement No. 1 Insured**;

H.   any natural person not covered under paragraphs A through F above who, at the express direction or request of a **Named Insured** or an **Endorsement No. 1 Insured**, renders the following **Professional Services** or **Managed Care Professional Services**:

    1.   service as a member of, a participant in, or a consultant to a formal medical accreditation, quality assurance, peer review or similar medical professional board or committee of a **Named Insured** or an **Endorsement No. 1 Insured**; or

    2.   service as a member of, a participant in, or a consultant to an institutional review board or committee or subcommittee of a **Named Insured** or an **Endorsement No. 1 Insured**; or

    3.   service as a member of, a participant in, or a consultant to an institutional animal use and care committee or subcommittee of a **Named Insured** or an **Endorsement No. 1 Insured**; or

    4.   service as a member of, a participant in, or a consultant to a privacy board or committee or subcommittee of a **Named Insured** or an **Endorsement No. 1 Insured**; or

    5.   service as a member of, a participant in, or a consultant to any other committee or subcommittee of a **Named Insured** or an **Endorsement No. 1 Insured** charged with reviewing the manner, procedures, or regulatory and other compliance related to the ethical and responsible conduct of research, including but not limited to the privacy of human research subjects, or

    6.   service (A) as a member of, a participant in, or a consultant to any entity or professional society charged with the duty of executing directives from, or (B) as a result of being charged with the duty of executing directives from:

        (a)   any such board, committee, subcommittee or society as described in paragraphs 1 through 6 above, or

        (b)   any Board of Trustees, Managers, Directors, Governors or similar advisory or governing board of a **Named Insured** or an **Endorsement No. 1 Insured**; or

    7.   peer review, utilization review, healthcare cost review, or any other similar activity connected with the ownership, management or operation of a managed care organization which activity is stated in the definition of **Managed Care Professional Services**; and

I.   1.   any natural person who, at the time of a **Medical Incident** or a **Managed Care Incident** giving rise to a **Claim** under this policy, was an **Insured** either:

        (a)   under Part 1, Section III.A, B, F or G, or

        (b)   by reason of being named on any schedule described under Part 1, Section III.C or D,

of either

        (i)   this policy or prior policies issued by the Company which this policy renews, or

        (ii)   any of the policies issued by Lexington Insurance Company with the following policy numbers: 8648006, 8647207, 8646106, 8645732, 8644353, 8644144, 8642582, 8641254, 5588764, 5588123, 5587773, 5587093, 5586431.

        (iii)   any of the policies issued by Northbrook Excess and Surplus Insurance Company with the following policy numbers: 63004741, 63005821, 63006870, 63008061, 63008831, 63009226.

2.   any organization which, at the time of a **Medical Incident** or a **Managed Care Incident** giving rise to a **Claim** under this policy, was an **Insured** by reason of being named on the schedule described under Part 1, Section III.E of either:

   (a)   this policy or prior policies issued by the Company which this policy renews, or

   (b)   any of the policies issued by Lexington Insurance Company with the following policy numbers: 8648006, 8647207, 8646106, 8645732, 8644353, 8644144, 8642582, 8641254, 5588764, 5588123, 5587773, 5587093, 5586431.

   (c)   any of the policies issued by Northbrook Excess and Surplus Insurance Company with the following policy numbers: 63004741, 63005821, 63006870, 63008061, 63008831, 63009226.

However, Part 1, Section III.H does not apply to any entity or natural person named on the schedule entitled "No Extended Reporting Period Insureds - Separate Risk Pool" submitted by a **Named Insured**.

Coverage as is afforded in Part 1, Section III.H to **Physicians**, **Dentists**, professional corporations, trusts, or partnerships may be canceled by the Company for non-payment of the premium due from the **Insured** for the **Prior Acts Period**. Cancellation will be the same as stated for non-payment of premium in Condition 12.

PART 2 - COMMERCIAL GENERAL LIABILITY

I.    INSURING AGREEMENTS:

Coverage A: Bodily Injury Liability

Coverage B: Property Damage Liability

To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages because of any Claim or Claims first made against the Insured during the period this Insurance is in force arising out of Bodily Injury or Property Damage sustained to which this Insurance applies caused by an Event occurring within the Policy Territory subsequent to the Insured's Retroactive Date and before the earliest of (a) the expiration or termination of this policy, (b) the Insured's termination of employment or association with a Named Insured or an Endorsement No. 1 Insured, or (c) the Insured's voluntary election not to be provided coverage by this policy.

Coverage C: Personal and Advertising Injury Liability

To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages because of any Claim or Claims first made against the Insured during the period this Insurance is in force arising out of Personal and Advertising Injury sustained to which this Insurance applies caused by an Event occurring within the Policy Territory subsequent to the Insured's Retroactive Date and before the earliest of (a) the expiration or termination of this policy, (b) the Insured's termination of employment or association with a Named Insured or an Endorsement No. 1 Insured, or (c) the Insured's voluntary election not to be provided coverage by this policy.

II.    EXCLUSIONS:

This Insurance under Part 2 does not apply:

A.    to any Claim directly or indirectly based upon, arising out of or resulting from a Medical Incident or a Managed Care Incident; provided, however, this exclusion shall not apply to Bodily Injury, Property Damage or Personal and Advertising Injury which is directly caused by the happening of one or more of the following:

   1.    fire or lightning;

   2.    windstorm or hail;

   3.    explosion;

   4.    riot, riot attending a strike or civil commotion;

   5.    Events involving an Aircraft or Automobile;

   6.    sonic shock waves;

   7.    smoke;

   8.    vandalism or malicious mischief;

   9.    sprinkler leakage;

   10.    Elevator malfunction;

   11.    earthquake or flood;

   12.    structural collapse of a building or part of a building; or

   13.    food or beverage poisoning;

B.    to Bodily Injury or Property Damage for which the Insured is obligated to pay Damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for Damages:

   1.    assumed in a contract or agreement that is an Insured Contract provided that the Bodily Injury or Property Damage occurs subsequent to the execution of the Insured Contract; or

   2.    that the Insured would have in the absence of the contract or agreement;

C.     to Bodily Injury or Property Damage arising out of the ownership, maintenance, use or entrustment to others of any Aircraft, Automobile, or watercraft owned or operated by or rented or loaned to any Insured. As used in this exclusion, "use" includes operations and loading and unloading.

This exclusion does not apply to:

1.     a watercraft while ashore on premises owned by or rented to the Insured;

2.     a watercraft the Insured does not own that is:

    (a)     less than 26 feet long; and

    (b)     not being used to carry persons or property for a charge;

3.     parking an Automobile on, or on the ways next to, premises owned by or rented to the Insured, provided the Automobile is not owned by or rented or loaned to any Insured;

4.     Bodily Injury arising out of entering into, occupying or alighting from any Automobile owned or operated by or rented to or loaned to the Insured which is designed to be used for specific medical examination or treatment purposes, including but not limited to, bloodmobiles, mobile mammography and X-ray units, while any such Automobile is stationary and being utilized in its designed function;

5.     liability assumed under any Insured Contract for the ownership, maintenance or use of Aircraft or watercraft; or

6.     Bodily Injury or Property Damage arising out of the operation of any of the equipment listed in paragraph A or B of the definition of Mobile Equipment;

D.     to Bodily Injury or Property Damage arising out of:

1.     the transportation of Mobile Equipment by an Automobile owned or operated by or rented or loaned to any Insured; or

2.     the use of Mobile Equipment in, or while in practice or preparation for a prearranged racing, speed or demolition contest or in any stunting activity;

E.     to Bodily Injury or Property Damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants at any time. This exclusion does not apply to Bodily Injury or Property Damage arising out of heat, smoke or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be;

F.     to Bodily Injury or Property Damage directly or indirectly based upon, arising out of or resulting from war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution;

G.     to Bodily Injury or Property Damage for which any Insured may be held liable by reason of:

1.     causing or contributing to the intoxication of any person;

2.     the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3.     any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

Provided that:

    (a)     this exclusion applies only if the Insured is engaged in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. The selling, furnishing, serving or giving of alcoholic beverages to patients or guests or the selling of wine in gift shops located on premises of an Insured does not constitute "the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages"; and

    (b)     this exclusion does not apply to Bodily Injury or Property Damage for which the Insured may be held liable by reason of the selling, serving, furnishing or giving of any alcoholic beverages at business meetings, charitable fund raising events or social affairs conducted at the direction of a Named Insured or an Endorsement No. 1 Insured;

H.    to any obligation for which the **Insured** or any carrier as insurer may be held liable under any Workers' Compensation, Unemployment Compensation or Disability Benefit Law or other similar law;

I.    to **Bodily Injury** to any employee of the **Insured** arising out of and in the course of his or her employment by the **Named Insured** or an **Endorsement No. 1 Insured** or to any obligation of the **Insured** to indemnify another because of **Damage** arising out of such injury, but this exclusion does not apply to liability assumed by the **Insured** under an **Insured Contract**;

J.    to **Property Damage** to:

    1.    property rented to or owned or occupied by an **Insured**;

    2.    premises sold, given away or abandoned by an **Insured**, if the **Property Damage** arises out of any part of those premises;

    3.    property loaned to an **Insured**;

    4.    personal property in the care, custody or control of an **Insured**;

    5.    that particular part of real property on which an **Insured** or any contractors or subcontractors working directly or indirectly on an **Insured's** behalf are performing operations, if the **Property Damage** arises out of those operations; or

    6.    that particular part of any property that must be restored, repaired or replaced because the **Named Insured's Work** was incorrectly performed on it.

Paragraph 2 of this exclusion does not apply if the premises are the **Named Insured's Work** and were never occupied, rented or held for rental by the **Insured**.

Paragraphs 3, 4, 5 and 6 of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph 6 of this exclusion does not apply to **Property Damage** included in the **Products-Completed Operations Hazard;**

K.    to **Property Damage** to the **Named Insured's Product** arising out of such product or any part of such product;

L.    to **Property Damage** to the **Named Insured's Work** arising out of such **Named Insured's Work** or any part of such **Named Insured's Work** and included in the **Products-Completed Operations Hazard**. This exclusion does not apply if the damaged **Named Insured's Work** or the **Named Insured's Work** out of which the **Damage** arises was performed on the **Insured's** behalf by a subcontractor;

M.    to **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

    1.    a defect, deficiency, inadequacy or dangerous condition in the **Named Insured's Product** or in the **Named Insured's Work**; or

    2.    a delay or failure by the **Insured** or anyone acting on an **Insured's** behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to the **Named Insured's Product** or the **Named Insured's Work** after it has been put to its intended use;

N.    to **Damages** claimed for any loss, cost or expense incurred by an **Insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

    1.    the **Named Insured's Product**;

    2.    the **Named Insured's Work**; or

    3.    **Impaired Property**;

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it;

O.  to Personal and Advertising Injury Liability:

    1.  arising out of oral or written publication of material, if done by or at the direction of the Insured with knowledge of its falsity;

    2.  arising out of oral or written publication of material whose first publication took place before the Retroactive Date applicable to the Insured;

    3.  arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the Insured or a criminal act committed by or at the direction of any Insured;

    4.  caused by or at the direction of the Insured with the knowledge that the act would inflict Personal and Advertising Injury;

    5.  assumed by the Insured under any contract or agreement except under an Insured Contract. This exclusion does not apply to liability for Damages that the Insured would have in the absence of the contract or agreement; or

    6.  caused by a breach of contract, except an implied contract to use another's advertising idea in the Insured's Advertisement;

Q.  to:

    1.  Bodily Injury (including all forms of radioactive contamination) or Property Damage:

        (a)  with respect to which an Insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (b)  resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

    2.  Bodily Injury (including all forms of radioactive contamination) or Property Damage resulting from the hazardous properties of nuclear material, if:

        (a)  the nuclear material (a) is at any nuclear facility owned by or operated by or on behalf of an Insured or (b) has been discharged or dispersed therefrom;

        (b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

        (c)  the Bodily Injury or Property Damage arises out of the furnishing by any Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility.

As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which had been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph 1 or 2 thereof;

"nuclear facility" means:

1.  any nuclear reactor;

    2.    any equipment or device designed or used for:

        (a)    separating the isotopes of uranium or plutonium;

        (b)    processing or utilizing spent fuel; or

        (c)    handling, processing or packaging waste;

    3.    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    4.    any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

    "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

R.    to any Claim by a prospective, current or former employee of any Insured directly or indirectly based upon, arising out of or resulting from Employment Practices;

S.    to Bodily Injury, Property Damage, or Personal and Advertising Injury arising in whole or in part, directly or indirectly, out of asbestos, regardless of whether the asbestos is:

    1.    airborne as a fiber or particle;
    2.    contained in a product;
    3.    carried or transmitted on clothing or by any other means; or
    4.    contained in, or a part of, any building, any building material, any insulation product, or any component part of any building, building material or insulation product;

T.    to any Claim directly or indirectly based upon, arising out of or resulting from any actual or alleged violation of any federal, state or local law proscribing antitrust, restraint of trade, unfair competition or price-fixing, or any rules or regulations promulgated thereunder;

U.    to any Claim directly or indirectly based upon, arising out of or resulting from any Event which:

    1.    underlies or is alleged in any legal, injunctive or administrative proceeding against an Insured brought prior to or pending on the effective date of the earliest Professional/General Liability policy covering the Insured issued by the Company and listed in Part 2, Section III.E which has been consistently renewed through this policy period; or

    2.    which was the subject of any notice under any other policy of insurance or self-insurance program prior to the effective date of the earliest Professional/General Liability policy covering the Insured issued by the Company and listed in Part 2, Section III.E which has been consistently renewed through this policy period;

V.    to any action or proceeding brought by or on behalf of any federal, state or local government regulatory agency or administrative agency, whether such action or proceeding is brought in the name of such agency, or by or on behalf of such agency in the name of another individual or entity, specifically including, but not limited to, any healthcare fraud or abuse proceeding alleging violations of the False Claim Act, 31 U.S.C. Section 3729, et seq., the Health Insurance Portability and Accountability Act of 1996, the Social Security Act, 42 U.S.C. Section 1320a, et seq., and any amendments or any rules or regulations promulgated thereunder, or any similar federal, state or local law or regulation;

W.    to any Claim directly or indirectly based upon, arising out of or resulting from actual or alleged Sexual Misconduct; or

X.    to any Claim for copyright, patent, trade name, trademark, trade dress or other infringement of intellectual property rights with the exception of the misappropriation of the advertising idea of another to the extent included in the definition of Personal and Advertising Injury.

III.    **PERSONS INSURED:**

    Each of the following is an Insured under Part 2 - Coverages A, B, and C to the extent set forth below:

    A.    Each Named Insured, each Endorsement No. 1 Insured, and any executive officer, or member of the

Board of Trustees, Managers, Directors, Governors or similar advisory or governing board of a **Named Insured** or an **Endorsement No. 1 Insured** while acting within the scope of his or her duties as such;

B.   Any employee of a **Named Insured** or an **Endorsement No. 1 Insured**, while performing his or her duties for a **Named Insured** or an **Endorsement No. 1 Insured**, but this insurance does not apply to **Bodily Injury** to another employee of a **Named Insured** or an **Endorsement No. 1 Insured** arising out of or in the course of his or her duties or employment;

C.   Any student or volunteer associated with a **Named Insured** or an **Endorsement No. 1 Insured** while acting within the scope of his or her duties or a program of approved medical instruction by a **Named Insured** or an **Endorsement No. 1 Insured**;

D.   Any **Physician**, **Dentist**, medical or dental resident or intern or professional corporation, trust or partnership (and its employees acting within the scope of their employment) who is a **Person Insured** under Part 1; provided that the insurance applies only to such person:

   1.   while acting within the scope of his or her or its duties for a **Named Insured** or an **Endorsement No. 1 Insured**; or

   2.   while engaged in the conduct of his or her or its professional business which is located on premises owned or leased by a **Named Insured** or an **Endorsement No. 1 Insured**;

E.   any employee of an insured **Physician** or **Dentist** who is a **Person Insured** under Part 1 provided that:

   1.   If such employee is a **Ratable AHP**, such employee has been designated by a **Named Insured** in the Insurance Category AHP in the Company's **Physician Exposure Management System**, and

   2.   the **Claim** against such employee arises from a **Medical Incident** or **Managed Care Incident** occurring

      a.   while such employee is acting within the scope or course of his or her professional employment by such **Physician** or **Dentist**, and

      b.   in connection with such **Physician** or **Dentist** rendering **Professional Services** or **Managed Care Professional Services**;

F.   any professional corporation, trust or partnership formed for a medically related purpose for whom a **Named Insured** has elected to provide coverage and who is designated with the Insurance Category "Medical Organization" in the Company's **Physician Exposure Management System** by such **Named Insured**, and the employees of such professional corporation, trust or partnership provided that;

   1.   If such employee is a **Ratable AHP**, such employee has been designated by a **Named Insured** in the Insurance Category AHP in the Company's **Physician Exposure Management System**, and

   2.   the **Claim** against such employee arises from a **Medical Incident** or **Managed Care Incident** occurring

      a.   while such employee is acting within the scope or course of his or her professional employment by such **Physician** or **Dentist**, and

      b.   in connection with such **Physician** or **Dentist** rendering **Professional Services** or **Managed Care Professional Services**;

G.   Any natural person or organization who, at the time of an **Event** or **Terrorism** giving rise to a claim under this policy, was an Insured under Part 2, Section III.A, B or C of:

   1.   this policy or prior policies issued by the Company which this policy renews;

   2.   any of the policies issued by Lexington Insurance Company with the following policy numbers: 8648006, 8647207, 8646106, 8645732, 8644353, 8644144, 8642582, 8641254, 5588764, 5588123, 5587773, 5587093, 5586431; or

   3.   any of the policies issued by Northbrook Excess and Surplus Insurance Company with the following policy numbers: 63004741, 63005821, 63006870, 63008061, 63008631, 63009226.

However, Part 2, Section III.E does not apply to any entity or natural person designated as "No Extended Reporting Period Insured - Separate Risk Pool" in the Company's **Physician Exposure Management System** by a **Named Insured**.

Coverage as is afforded in Part 2, Section III.E to **Physicians**, **Dentists**, professional corporations, trusts,

or partnerships may be canceled by the Company for non-payment of the premium due from the **Insured** for the **Prior Acts Period.** Cancellation will be the same as stated for non-payment of premium in Condition 12.

**DEFINITIONS APPLICABLE TO PARTS 1 AND 2:**

When used in Part 1 or in Part 2 (including endorsements forming a part thereof):

**"Administrative Event"** means:

    a. any administrative or judicial proceeding instituted by a government agency or the formal professional review body of any other organization (which is not an Insured or an affiliate of an Insured), to examine allegations of:

        i. improper professional conduct or incompetence in the practice of a Physician's, Dentist's or other professional's health care profession; or

        ii. the performance of health care services in violation of recognized standards of practice or established guidelines for the appropriate utilization of such services; or

    b. any administrative or judicial proceeding instituted by a government agency directly or indirectly based upon, arising out of or resulting from the Health Insurance Portability and Accountability Act of 1996, as amended.

However, an **Administrative Event** shall not include the following:

    A. any healthcare fraud or abuse proceeding, including, but not limited to, a proceeding alleging violations of the False Claim Act, 31 U.S.C. Section 3729 et seq., the Social Security Act, 42 U.S.C. Section 1320a, et seq., and any amendments or any rules or regulations promulgated thereunder, or any similar federal, state or local law or regulation;

    B. any disciplinary action initiated against: (i) a **Physician** or **Dentist** by a **Named Insured** or an **Endorsement No. 1 Insured** which has elected to provide coverage to such **Physician** or **Dentist** in accordance with Part 1, Section III.C or (ii) a professional who is an **Insured** and an employee of the **Named Insured** or the **Endorsement No. 1 Insured** which initiates such disciplinary action;

    C. any proceeding directly or indirectly based upon, arising out of or resulting from dishonest, fraudulent, malicious, unlawful or unethical acts committed by or with the consent of the **Insured.**

**"Administrative Event Legal Fees"** means reasonable legal fees and expenses for legal services actually rendered by a licensed attorney or law firm, but does not include any fine, penalty or monetary or non-monetary relief.

**"Advertisement"** means a notice to the general public or specific market segments about any **Insured's** goods, products or services for the purpose of attracting patients, customers or supporters which notice is broadcast or published by any **Insured,** provided that such notice is approved in writing by the **Named Insured** or an **Endorsement No. 1 Insured** listed on Endorsement No. 12. The broadcast or publication may be by any means, including electronic communications.

**"Aircraft"** means any heavier than air or lighter than air aircraft designed to transport any person, property, missile, or spacecraft.

**"Automobile"** means a land motor vehicle, trailer or semi-trailer designed for travel on public roads including any machinery or apparatus attached thereto, but does not include **Mobile Equipment.**

**"Bodily Injury"** means physical injury, sickness or disease, sustained by any person which occurs subsequent to the **Insured's Retroactive Date,** including death at any time resulting thereafter.

**"Claim"** means any:

    a. written demand for **Damages;**

    b. civil adjudicatory proceeding seeking **Damages** commenced by service of a complaint or summons; or

    c. **Administrative Event** covered under the exception to Part 1, Section II.I.

"Damages" means:

a.    all damages, including damages for death, plus

b.    all such other amounts in accordance with Condition 11.

Damages does not include fines, penalties or taxes.

"Deductible" means the Insurer Deductible as defined in the Terrorism Risk Insurance Act of 2002, as amended.

"Dentist" means any person who has received a degree of Doctor of Dental Science or its equivalent and who is licensed to practice dentistry, provided that it shall not include a person with such qualifications who in the normal course of his or her professional duties does not render any dental services in the treatment of other persons.

"Elevator" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an Automobile servicing hoist, or a hoist on a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet.

"Employment Practices" means actual or alleged:  breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline or evaluation of employees; discrimination or harassment of any kind or on any basis, including, but not limited to, race, sex, marital status, ancestry, actual or perceived physical or mental handicaps, age, sexual preference, pregnancy or religion or other status protected by any federal, state or local statute or ordinance; humiliation, defamation, libel or slander of any present or former employee or applicant for employment, employment-related retaliation; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies or procedures.

"Endorsement No. 1 Insured" means any entity listed in Endorsement No. 1.

"Event" means an accident, including continuous or repeated exposure to conditions, subsequent to the Insured's Retroactive Date, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured. With respect to Personal and Advertising Injury, an Event means an offense listed in paragraphs i through vi of the definition of Personal and Advertising Injury. All Bodily Injury, Property Damage and Personal and Advertising Injury arising (a) out of continuous or repeated exposure to substantially the same general conditions or (b) out of one lot of goods or products manufactured, prepared, acquired, sold, handled or distributed by the Named Insured or an Endorsement No. 1 Insured or by another trading under its name shall be considered as arising out of one Event, regardless of the number of persons or entities who/which sustain Bodily Injury, Property Damage or Personal and Advertising Injury; and all Bodily Injury, Property Damage and Personal and Advertising Injury arising out of an Event shall for the purpose of determining limits of the Company's liability be considered one Claim under this policy. Any Claim for assault and battery against an Insured resulting from any act of protecting any person or property on behalf of a Named Insured or an Endorsement No. 1 Insured shall be considered an Event under Part 2 of this policy.

"Impaired Property" means tangible property, other than the Named Insured's Product or the Named Insured's Work, that cannot be used or is less useful because:

a.    it incorporates the Named Insured's Product or the Named Insured's Work that is known or thought to be defective, deficient, inadequate or dangerous; or

b.    the Insured has failed to fulfill the terms of a contract or agreement, if such property can be restored to use by:

    i.    the repair, replacement, adjustment or removal of the Named Insured's Product or the Named Insured's Work; or

    ii.    the fulfillment of the terms of a contract or agreement by the Insured.

"Insured Contract" means any oral or written contract relating to the Insured's business subject to the applicable exclusions under Part 2 of this policy and the following exclusions. This insurance does not apply:

a.    to Bodily Injury, Property Damage or Personal and Advertising Injury for which the Insured has assumed contractual liability, if such injury or Damage occurred prior to the execution of the contract;

b.    If the indemnitee of the Insured is an architect, engineer or surveyor, to the liability of the indemnitee, his or her agents or employees, arising out of:

    i.    the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

    ii.    the giving of or the failure to give directions or instructions by the indemnitee or his or her agents or employees, provided such giving or failure to give is the primary cause of the Bodily Injury or Property Damage;

    c.    to contracts under which the Insured, if an architect, engineer, or surveyor, assumes liability for injury or Damage arising out of the Insured's rendering of or failure to render professional services, including those listed in paragraph b above, and supervisory, inspection or engineering services; or

    d.    to a contract that indemnifies any person or organization for Damages caused by fire to premises rented or loaned to an Insured.

"Insured" means any person or organization qualifying as an Insured under Persons Insured provisions of the applicable insurance coverage. Insurance afforded applies separately to each Insured against whom a Claim is made or suit is brought except with respect to the limit of the Company's liability.

"Managed Care Incident" means any act, error or omission by or on behalf of an Insured in rendering or failing to render Managed Care Professional Services in the operation of a Managed Care Organization. Any such act, error or omission together with all related acts, errors or omissions in performing or failing to perform Managed Care Professional Services to any number of persons shall be considered one Managed Care Incident. For the purpose of determining the limits of the Company's liability, any Claim or Claims arising out of such Managed Care Incident, including without limitation, Claims by a spouse, children or other next of kin of such person or persons, shall be considered one Claim under this policy.

"Managed Care Professional Services" means:

    a.    utilization review activities, being the process of evaluating the appropriateness or necessity of proposed or already performed professional services of a medical nature, or the reasonableness of the proposed or already incurred costs of such services, for the purpose of determining whether such services or costs will be approved by the Insured, regardless of whether such evaluation is done prospectively, concurrently or retrospectively; and

    b.    the following where performed for a third party for consideration: quality assessment or cost review of healthcare services performed; performing disease management or case management; development or implementation of clinical guidelines, practice parameters or protocols; wellness or health promotion education; designing managed health care plans; appointment and reappointment, credentialing, and delineation of clinical privileges for managed health care plans; processing applications for managed health care plans; enrollment processing for managed health care plans; issuing policies or certificates of insurance for managed health care plans; determining eligibility for coverage under managed health care plans; adjusting, investigating or handling claims for benefits or coverages under managed health care plans; marketing managed health care plans; selecting or contracting with health care providers; reimbursing or paying health care providers; data processing services for managed health care plans; recovery and subrogation services in respect of managed health care plans; risk management and loss control operations solely with respect to managed health care plans.

"Medical Incident" means any act, error or omission by or on behalf of an Insured in the furnishing of or the failure to furnish Professional Services which causes or allegedly causes injury to any person. Any such act, error or omission together with all related acts, errors or omissions in the furnishing of or failure to furnish Professional Services which causes or allegedly causes injury to any number of persons shall be considered one Medical Incident. For the purpose of determining the limits of the Company's liability, any Claim or Claims arising out of such Medical Incident, including without limitation claims by a spouse, children, or other next of kin of such person or persons, shall be considered one Claim under this policy.

"Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a.    bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b.    vehicles maintained for use solely on or next to premises owned by or rented to an Insured;

    c.    vehicles that travel on crawler treads;

    d.    vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        i.    power cranes, shovels, loaders, diggers or drills; or

        ii.    road construction or resurfacing equipment such as graders, scrapers or rollers;

    e.    vehicles not described in paragraphs a, b, c or d above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        i.    air compressors, pumps, and generators, including spraying, welding, building cleaning

equipment, geophysical exploration, lighting and well servicing equipment; or

    ii.    cherry pickers and similar devices used to raise or lower workers; or

f.    vehicles not described in paragraphs a, b, c or d above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not **Mobile Equipment** but will be considered **Automobiles**:

A.    equipment designed primarily for:

    i    snow removal;

    ii    road maintenance, but not construction or resurfacing; or

    iii    street cleaning;

B.    cherry pickers and similar devices mounted on an **Automobile** or truck chassis and used to raise or lower workers; and

C.    air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**"Named Insured"** means each institution named under the heading "Named Insured" on the Declarations Page of this policy.

**"Named Insured's Product"** means:

    a.    any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        i.    the Named Insured or an Endorsement No. 1 insured;

        ii.    another trading under the Named Insured's or an Endorsement No. 1 Insured's name; or

        iii.    a person or organization whose business or assets the Named Insured or an Endorsement No. 1 Insured acquired; and

    b.    containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Named Insured's Product** includes:

    a.    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the Named Insured's Product, and

    b.    the providing of or failure to provide warnings or instructions.

**Named Insured's Product** does not include vending machines or other property rented to or located for use of others but not sold.

**"Named Insured's Work"** means:

    a.    work or operations performed by the Named Insured or an Endorsement No. 1 insured or on behalf of the Named Insured or an Endorsement No. 1 Insured; and

    b.    materials, parts or equipment furnished in connection with such work or operations.

**Named Insured's Work** includes:

    a.    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the Named Insured's Work, and

    b.    the providing of or failure to provide warnings or instructions.

**"Personal and Advertising Injury"** means injury to a person or organization, including consequential **Bodily Injury**, arising out of one or more of the following offenses committed: (a) as respects clauses i through v below, in the conduct of the Named Insured's business or the business of an Endorsement No. 1 Insured listed on Endorsement No. 13, or (b) as respects clause vi below, in the conduct of any Insured's business:

    i.    false arrest, detention or imprisonment;

    ii.    malicious prosecution;

iii.    wrongful entry, wrongful eviction or other invasion of the right of privacy;

iv.    oral or written publication or utterance of material that slanders, libels or defames a person or organization or disparages a person's or organization's goods, products, or services;

v.    oral or written publication of material that violates a person's right to privacy; or

vi.    the use of another's advertising idea in an **Advertisement**.

**"Physician"** means any person who has received a degree of Doctor of Medicine or its equivalent and who is licensed to practice medicine, provided that it shall not include a person with such qualifications who in the normal course of his or her professional duties does not render any medical or surgical services in the treatment of other persons.

**"Policy Territory"** means anywhere in the world.

**"Pollutants"** mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**"Prior Acts Period"** means the period between the **Insured's Retroactive Date** and the effective date of coverage for that **Insured**.

**"Products-Completed Operations Hazard"** includes Bodily Injury and Property Damage occurring away from premises owned by or rented to an **Insured** and arising out of the **Named Insured's Product** or the **Named Insured's Work** except:

a.    products that are still in the **Insured's** physical possession; or

b.    work that has not yet been completed or abandoned.

The **Products-Completed Operations Hazard** includes Bodily Injury and Property Damage occurring on premises owned or rented by an **Insured** solely as respects the food service operations of an **Insured** and arising out of the **Named Insured's Product** after the physical possession of such products has been relinquished to another.

The **Named Insured's Work** will be deemed completed at the earliest of the following times:

a.    when all of the work called for in the **Insured's** contract has been completed;

b.    when all the work to be done at the site has been completed if the **Insured's** contract calls for work at more than one site; and

c.    when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**Products - Completed Operations Hazard** does not include Bodily Injury or Property Damage arising out of:

a.    the transportation of property, unless the Injury or Damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it; or

b.    the existence of tools, uninstalled equipment or abandoned or unused materials.

**"Professional Services"** means:

a.    healthcare services, including but not limited to:

i.    medical, surgical, dental, nursing or other professional healthcare treatment or services, including the furnishing of food or beverage in connection therewith;

ii.    furnishing or dispensing of drugs or medical, dental, or surgical supplies or appliances if the Injury occurs after the **Insured** has relinquished possession thereof to others;

iii.    handling or performing post mortem examinations on human bodies;

iv.    veterinary services; and

v.    services as a member of or as a participant in or a consultant to a formal medical

accreditation, quality assurance, peer review or similar medical professional board or committee of a **Named Insured** or an **Endorsement No. 1 Insured** or of any entity or professional society at the express direction of a **Named Insured** or an **Endorsement No. 1 Insured**, or as a person charged with the duty of executing directives from:

    (a)    any such board, committee or society; or

    (b)    any Board of Trustees, Managers, Directors, Governors or similar advisory or governing board of a **Named Insured** or an **Endorsement No. 1 Insured**; and

b.    any services of a non-medical, professional nature as a member of or as a participant in any non-medical professional society, association or group provided that such service is within the scope or course of the **Insured's** professional employment with a **Named Insured** or an **Endorsement No. 1 Insured** or a program of approved medical instruction by a **Named Insured** or an **Endorsement No.1 Insured**.

**"Property Damage"** means:

a    physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **Event** that caused it.

**"Ratable AHP"** means a Physician Assistant, Certified Registered Nurse Anesthetist, Certified Nurse Midwife, or Certified Registered Nurse Practitioner who is employed by an **Insured**.

**"Retroactive Date"** means:

a.    as respects any **Physician**, **Dentist** or medical or dental resident or intern, that date as of which a **Named Insured** elects to provide coverage hereunder as evidenced by the naming of the **Physician**, **Dentist** or medical or dental resident or intern, on the schedule submitted by such **Named Insured**;

b.    as respects a **Named Insured**, the date as shown on the Declarations Page;

c.    as respects any **Endorsement No.1 Insured**, the date as shown in that endorsement; and

d.    as respects any other **Insured**, that date shown on the Policy Declarations Page for the **Named Insured** with which such person is affiliated or on Endorsement No. 1 for an **Endorsement No. 1 Insured** with which such person is affiliated, or the employment or date of association with a **Named Insured** or an **Endorsement No. 1 Insured**, whichever is later.

**"Sexual Misconduct"** means any welcome or unwelcome conduct, physical acts, gestures or written or spoken words of a sexual nature, including sexual intimacy, molestation, assault, battery, abuse, harassment or exploitation.

**CONDITIONS APPLICABLE TO PARTS 1 AND 2:**

1.    **LIMITS OF LIABILITY:**

Regardless of the number of **Insureds** under Parts 1 and 2 of this policy, the Company's liability is as follows:

(a)    Part 1:

    1.    The each **Claim** limit of liability stated under Endorsement No. 2 applicable to each **Claim** is the limit of the Company's liability for all **Damages** arising out of the causal **Medical Incident**, **Managed Care Incident** or both under Part 1 of this policy. Where a **Medical Incident** and a **Managed Care Incident** both occur during the same course of treatment or services and contribute to injury to the same person, only one each **Claim** limit of liability applies.

    2.    The sublimit of liability stated under paragraph a of Part 3 of Endorsement No. 2 applicable to the defense of each **Physician**, **Dentist**, other professional who is an **Insured** or employee of a **Named Insured** or **Endorsement No. 1 Insured** against each **Administrative Event** covered under the exception to Part 1, Section II.I of this policy is the limit of the Company's liability for all **Administrative Event Legal Fees** incurred to defend such individual against such **Administrative Event**. That sublimit of liability is subject to and included within the annual aggregate sublimit of liability stated under paragraph b of Part 3 of Endorsement No. 2

for all **Administrative Event Legal Fees** incurred to defend all **Administrative Events** against each **Physician, Dentist**, other professional who is an **Insured** or employee of a **Named Insured** or **Endorsement No. 1 Insured.**

3.  The each **Administrative Event** sublimits of liability are included within the each **Claim** limit of liability stated under Part 1 of Endorsement No. 2.

(b)   Part 2:

The limit of liability stated under Endorsement No. 2 applicable to each **Claim** is the limit of the Company's liability for all **Damages** arising out of the causal **Event** under Part 2 of this policy.

(c)   Parts 1 and 2:

Under no circumstances shall any **Damages** payable under Part 1 of this policy be eligible for any payment under Part 2 of this policy.

Under no circumstances shall any **Damages** payable under Part 2 of this policy be eligible for any payment under Part 1 of this policy.

In the event that **Damages** are attributable to the same causal event or interrelated events and are payable under both Part 1 and Part 2 of this policy, it is understood and agreed that only a single limit of liability shall apply and that limit shall be that as provided under Part 1 of this policy.

The inclusion in this policy of more than one **Insured** shall not operate to increase the limits of the Company's liability.

2.   **WHEN A CLAIM IS MADE:**

(a)   A **Claim** will be considered to be first made under Part 1 at the earlier of the following times:

1.  when the Risk Manager or Legal Department (or equivalent thereof) of the related **Named Insured** or any other person or organization listed on Endorsement No. 14 first receives written notice of the **Claim**; or

2.  when the **Insured** first gives the Company written notice of a potential **Claim** and such notice is received by the Company of specific circumstances involving a particular person or persons, which may reasonably result in a **Claim** under this policy.

All **Claims** for all injuries arising out of the same causal **Medical Incident, Managed Care Incident** or both shall be considered as one **Claim** having been made at the time the first **Claim** is made resulting from such **Medical Incident, Managed Care Incident** or both.

(b)   A **Claim** will be considered to be first made under Part 2 at the earlier of the following times:

1.  when the Risk Manager or Legal Department (or equivalent thereof) of the related **Named Insured** or any other person or organization listed on Endorsement No. 14 first receives written notice of the **Claim**; or

2.  when the **Insured** first gives the Company written notice of a potential **Claim** and such notice is received by the Company of specific circumstances involving a particular person, persons or property, which may reasonably result in a **Claim** under this policy.

All **Claims** for all **Property Damage, Bodily Injury** or **Personal and Advertising Injury** arising out of the same **Event** shall be considered as one **Claim** having been made at the time the first **Claim** is made resulting from such **Event**.

(c)   A report made by the **Insured** for underwriting, quality control purposes, or loss control engineering including incident reports, shall not be considered to be a "**Claim** made" for purposes of insurance under Parts 1 and 2.

3.   **PREMIUM:**

Premium designated on the Declarations Page is a deposit premium only, which shall be credited to the amount of the earned premium determined in accordance with the Company's rating plan and due to the Company hereunder. The Company shall give notice to the **Named Insureds** of additional or return premiums so determined. The **Named Insureds** shall cause to be maintained records of such information as is reasonably necessary for premium computation, and shall send copies of such records to the Company at the end of the policy period and at such other times as the Company may reasonably request.

4.    **INSURED'S DUTIES IN CASE OF EVENT, CLAIM OR SUIT:**

(a)    Written notice of any Claim shall be given by or for the Insured to the Company or any of its authorized agents as soon as practicable after the Claim is made, but in no event later than 30 days after the termination of this policy.  The notice must contain particulars sufficient to identify the Insured and all reasonably obtainable information with respect to time, place and circumstances thereof, and the names and addresses of the injured parties and of available witnesses.

(b)    If a Claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

(c)    The Insured shall cooperate with the Company and, upon the Company's request, shall:

1.    assist in making settlements;

2.    assist in the conduct of suits, including the compilation, submission and preparation of documents required by statute, legal rule or court order;

3.    assist in securing and giving evidence and obtaining the attendance of witnesses for court proceedings;

4.    attend depositions, hearings and trials; and

5.    endorse any right of contribution or indemnity against any person or organization which may be liable to the Insured because of injury or damage with respect to which insurance is afforded under this policy or subsequent renewals thereof.

(d)    A material failure by an Insured to timely perform any of his, her or its obligations under this paragraph 4 shall be sufficient grounds for a refusal by the Company to pay for the related Claim or Claims and/or the removal of such Insured from any list or schedule of Insureds under the "Persons Insured" clause of Part 1 and/or Part 2 of this policy, in addition to any other rights the Company may possess.

(e)    The Insured shall not, except at his or her or its own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid at the time of the incident or Event.

(f)    Within 45 days after the expiration of this policy, each Named Insured shall compile a final list of all existing notices of Claim and potential Claim reports related to such Named Insured and all other Insureds sponsored by it.  Such list shall be transmitted to the Company by each Named Insured and the Company shall be able to rely on this transmission with impunity, except that the Company will not refuse to accept any Claim inadvertently omitted from this list which Claim was previously reported during the policy period.  Such list shall constitute an acknowledgment by all Insureds that said list constitutes the total of all Claims made during the policy period.

5.    **ACTION AGAINST COMPANY:**

No action shall lie against the Company unless, as a condition precedent thereto, there shall have been compliance in all material respects with the terms of this policy, nor until the amount of the Insured's obligations to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Named Insured, claimant and the Company. No person or organization shall have any right under this policy to join the Company as a party to any action against the Insured to determine the Insured's liability, nor shall the Company be impleaded by the Insured or his legal representative. Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

6.    **OTHER INSURANCE:**

Except when an Insured has other insurance which would apply to the Claim covered under Part 2 of this policy, the insurance afforded by this policy is primary insurance, except when this insurance is stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the Claim on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the Claim on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the Damages than that stated in the applicable contribution provision below:

(a)    CONTRIBUTION BY EQUAL SHARES. If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of any **Damages** than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit if liability under any one policy or the full amount of the **Damages** is paid, and with respect to any amount of **Damages** not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the **Damages** until such insurer has paid its limit in full or the amount of the **Damages** is paid.

(b)    CONTRIBUTION BY LIMITS. If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such **Damages** bears to the total applicable limit of liability of all valid and collectible insurance against such **Damages**.

7.    **SUBROGATION:**

In the event of any payment under this policy, the Company shall be subrogated to all the **Insured's** rights of recovery thereof against any person or organization and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing after the incident or **Event** to prejudice such rights.

8.    **CHANGES:**

Notice to any agent or knowledge possessed by any agent or by any other person shall not affect a waiver or a change in any part of this policy or stop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by an authorized representative of the Company.

9.    **ASSIGNMENT:**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed thereon.

10.    **DEFENSE AND SETTLEMENT:**

The Company shall have the right and option to defend any **Claim** against an **Insured** seeking **Damages** even if any of the allegations of the **Claim** are groundless, false or fraudulent and the Company may make such investigations as it deems expedient. The Company shall not be obligated to pay any **Claim**, judgment, or expense or to defend any **Claim** after the applicable limit of the Company's liability has been exhausted.

11.    **EXPENSES – COSTS:**

This policy covers as part of the applicable limit of liability and not in addition thereto:

(a)    all allocated **Claim** expenses, including without limitation reasonable fees and expenses, including attorneys' and experts' fees, incurred by the Company in defending any **Claim**, all costs taxed against the **Insured** in any **Claim** defended by the Company, and all interest on the entire amount of any judgment herein which accrues after entry of judgment and before the Company has paid or tendered or deposited in the court that part of the judgment which does not exceed the limit of the Company's liability thereon; and

(b)    premiums of Appeal Bonds required in any suit and premiums on bonds to release attachment on any such suit for an amount not in excess of the applicable amount of liability of this policy, but the Company shall have no obligation to apply for or furnish any such bond.

12.    **CANCELLATION:**

Coverage as is afforded to an **Insured** other than a **Named Insured** under this policy may be canceled for reasons as determined by the Company, by the Company mailing written notice to the **Insured** stating when thereafter such cancellation shall be effective. The coverage may be canceled by the Company by mailing to the **Insured** at the address of the **Insured** on file with the Company written notice stating when, not less than thirty (30) days thereafter (45 days in Connecticut), such cancellation shall be effective; provided, however, if such cancellation is for non-payment of premium, the Company is required to give only at least ten (10) days written notice. Proof of mailing of the notice shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the coverage period for the **Insured**. Delivery of such written notice by the Company to the **Insured** shall be equivalent to mailing. If the Company cancels coverage for an **Insured**, earned premium shall be computed prorata of the premium charged, and such earned premium is payable by the **Insured** on the date of cancellation.

13.    **CHOICE OF LAW:**

This policy shall be governed by and construed in accordance with the internal laws of the State of Vermont, provided, however, that the provisions, stipulations, exclusions and conditions of this policy are to be construed in an evenhanded fashion, as between the Insured and the Company.


14.    **DECLARATION:**

By acceptance of this policy, the Named Insured agrees that the statements in the application and other materials submitted during underwriting are its agreements and representations; that this policy is issued in reliance upon the truth of such representations; that this policy embodies all agreements existing between the Named Insured and the Company or any of its representatives relating to the scope of coverage of insurance.

ENDORSEMENT NO. 1

SCHEDULE OF INSUREDS

A.    It is agreed that such insurance as is afforded by this policy as respects the Named Insureds THE JOHNS HOPKINS HOSPITAL and THE JOHNS HOPKINS UNIVERSITY applies to the following entities, each as Insured:

DATE                                                                              RETROACTIVE

1.    Johns Hopkins Bayview Medical Center                                        July 1, 1984
      (formerly known as Francis Scott Key Medical Center, Inc.)
      4940 Eastern Avenue
      Baltimore, MD 21224

2.    The Johns Hopkins Medical Services Corporation
      3100 Wyman Park Drive
      Baltimore, MD 21211

      As respects the former operations of:
           Homewood Hospital Center, Inc.                                         July 1, 1986
           Johns Hopkins Health Plan, Inc.                                        July 1, 1985

      In accordance with Condition 6 of this policy, it is hereby stated that such insurance
      is excess insurance and not primary insurance and applies in excess of any valid
      and collectible insurance afforded by Ohio Insurance Company policy #HPP-86-
      3816 and policy #HPP-86-3816-00-OH.

3.    Wyman Park Medical Associates                                               January 1, 1990
      Homewood Hospital Center North
      3100 Wyman Park
      Baltimore, MD 21211

4.    Broadway Services, Incorporated                                            February 25, 1982

      Coverage applies solely as respects Broadway Services,
      Incorporated's liability arising out of work performed for The
      Johns Hopkins Hospital and The Johns Hopkins University and
      any other insured listed under Part A of this Endorsement No.
      1 (other than Broadway Services, Incorporated).

5.    Johns Hopkins Health Systems Corporation                                    March 13, 1986
      600 North Wolfe Street
      Baltimore, MD 21205

6.    The Johns Hopkins Hospital Endowment Fund, Inc.                             July 1, 1987
      600 North Wolfe Street
      Baltimore, MD 21205

7.    The Johns Hopkins Home Care Alternatives, Inc.                             July 1, 1990
      2917 East Biddle Street
      Baltimore, MD 21213

8.    The Johns Hopkins Home Care, Inc.                                          July 1, 1990
      2921 East Biddle Street
      Baltimore, MD 21213

9.    The Johns Hopkins Health Services, Inc.                                    July 1, 1990
      East Biddle Street
      Baltimore, MD 21213
      (formerly known as Johns Hopkins Home Care, Inc. and as respects the former
      operations of Johns Hopkins Home Care Alternatives, Inc.)

10.   The Johns Hopkins Outpatient Center Condominium, Inc.                      May 1, 1992
      601 North Caroline Street
      Baltimore, MD 21205

      Such insurance as is afforded by this policy under Part 2 applies to the property
      known as lot 12A as recorded among the Land Records of Baltimore

City, Maryland as Plot No. 3328 and the improvements constructed thereon.

| | | |
|---|---|---|
| 11. | The Johns Hopkins Home Care Group, Inc.<br>2400 Broening Highway<br>Baltimore, MD 21224 | December 8, 1992 |
| 12. | Johns Hopkins Pediatrics at Home, Inc.<br>2400 Broening Highway<br>Baltimore, MD 21224 | December 17, 1992 |
| 13. | Johns Hopkins Pharmaquip, Inc.<br>2400 Broening Highway<br>Baltimore, MD 21224 | February 25, 1993 |
| 14. | The Johns Hopkins Suburban Health Center Limited Partnership<br>600 North Wolfe Street<br>Baltimore, MD 21287 | July 1, 1994 |
| 15. | Broadway Medical Management Corp.<br>10755 Falls Road<br>Lutherville, MD 21093 | July 1, 1994 |
| 16. | Johns Hopkins Suburban Health Group at Green Spring Station, Inc.<br>10755 Falls Road<br>Lutherville, MD 21093 | July 1, 1994 |
| 17. | Ophthalmology Associates, LLC<br>10755 Falls Road<br>Lutherville, MD 21093 | July 1, 1994 |
| 18. | Johns Hopkins Health Care, LLC<br>600 North Wolfe Street<br>Baltimore, MD 21287 | October 12, 1994 |
| 19. | Francis Scott Key Medical Center, Inc.<br>is an **Insured** under this policy for its operations from July 1, 1984<br>to April 26, 1994 | |
| 20. | EHP Employee Health Plans, Inc.<br>The Candler Building, Suite 920<br>111 Market Place<br>Baltimore, MD 21202 | June 26, 1995 |
| 21. | Priority Partners Managed Care Organization, Inc.<br>The Candler Building, Suite 920<br>111 Market Place<br>Baltimore, MD 21202 | October 31, 1996 |
| 22. | The Foundation for Advanced Education in the Sciences, Inc. (FAES)<br>One Cloister Court<br>Box 101<br>Bethesda, MD 20814-1460 | October 1, 1997 |

Coverage as is afforded to FAES by this policy applies only to the liability of FAES
for the activities of Fellows insured by this policy.

| | | |
|---|---|---|
| 23. | Johns Hopkins Imaging, L.L.C.<br>10755 Falls Road<br>Lutherville, MD 21093 | May 10, 1996 |

In accordance with Condition 6 of this policy, it is hereby stated that such insurance
as is afforded by this policy is excess insurance and not primary insurance and
applies in excess of any valid and collectible insurance afforded by Physicians
Insurance Exchange (PIE) Insurance Company or through state guaranty funds.

| | | |
|---|---|---|
| 24. | Howard County General Hospital<br>5755 Cedar Lane<br>Columbia, MD 21044 | January 1, 1983 |

| | | |
|---|---|---|
| 25. | Howard Home Health Corporation<br>5755 Cedar Lane<br>Columbia, MD 21044 | January 1, 1983 |
| 26. | Howard County Health Services, Inc.<br>5755 Cedar Lane<br>Columbia, MD 21044 | January 1, 1983 |
| 27. | Cedar Emergency Services, Inc.<br>5755 Cedar Lane<br>Columbia, MD 21044 | January 1, 1999 |
| 28. | The Johns Hopkins Home Health Services, Inc.<br>600 North Wolfe Street<br>Baltimore, MD 21287<br>September 26, 1996 | January 17, 1993 |
| 29. | Central Maryland Heart Center, Inc.<br>1996<br>5755 Cedar Lane, Suite 201<br>Columbia, MD 21044 | September 26, |
| 30. | HSI Medical Services Corporation<br>5755 Cedar Lane<br>Columbia, MD 21044 | September 1, 1993 |
| 31. | Ambulatory Blood Gas Services, Inc.<br>5759 Cedar Lane<br>Columbia, MD 21044 | February 1, 1987 |
| 32. | JH Ventures, LLC<br>600 North Wolfe Street<br>Baltimore, MD 21287 | November 15, 1999 |

JH Ventures, LLC includes:

| | |
|---|---|
| JH Ventures, LLC/JHHC Participating Physicians Series | May 1, 2000 |
| JH Ventures, LLC/Green Spring Patient First Series | May 1, 2000 |
| JH Ventures, LLC/Frederick Neonatal Services Series | January 1, 2000 |
| JH Ventures, LLC/Howard County Services Series | January 1, 2000 |
| JH Ventures, LLC/Scott Maurer, M.D. Series | March 20, 2000 |
| JH Ventures, LLC/Johns Hopkins Emergency Medical Services, LLC Series | November 15, 2000 |
| JH Ventures, LLC/Broadway Acquisition and Development Series | November 1, 2000 |

JH Ventures, LLC/Broadway Acquisition and Development Series is an Insured only for the coverage as provided under Part 2 of this policy.

| | | |
|---|---|---|
| 33. | The Johns Hopkins Parking Corporation<br>600 North Wolfe Street<br>Baltimore, MD 21287 | August 9, 1996 |
| 34. | JHCO, LLC<br>600 North Wolfe Street<br>Baltimore, MD 21287 | November 16, 1999 |
| 35. | Integrated Renal Solutions, LLC<br>1013 Senter Road<br>Wilmington, DE 19805-1291 | December 13, 1999 |
| 36. | Howard Hospital Foundation, Inc.<br>5755 Cedar Lane<br>Columbia, MD 21044 | January 1, 1999 |
| 37. | GammaPlus Baltimore, LLC<br>600 North Wolfe Street<br>Blalock B-179<br>Baltimore, MD 21205 | October 29, 2002 |
| 38. | American Radiology Services, Inc., d/b/a American Radiology Services of Maryland, Inc.<br>1838 Greene Tree Road, Suite 450<br>Baltimore, MD 21208 | |

Such insurance as is afforded by this policy to American Radiology Services, Inc. does not apply to any Claim or Claims:

   (a) directly or indirectly based upon, arising out of or resulting from a **Medical Incident** or **Managed Care Incident**; or

   (b) arising out of **Bodily Injury, Property Damage** or **Personal and Advertising Injury** sustained caused by an **Event**;

that are directly or indirectly based upon, arise out of or result from the activities of:

   (i) American Radiology Services, Inc., d/b/a American Radiology Services of Maryland, Inc. conducted outside the State of Maryland

   (ii) American Radiology Associates, P.A. conducted outside the State of Maryland;

   (iii) any physician employed by or associated with American Radiology Associates, P.A. conducted outside the State of Maryland; or

   (iv) any employee of American Radiology Associates, P.A. conducted outside the State of Maryland.

Effective Date:       September 10, 2004
Retroactive Date:   December 31, 2002

39.   Whitesquare Nephrology                                          May 1, 2005
        800 N. Wolfe St.
        Baltimore, MD 21237

40.   FSK Land Corporation                                           October 15, 2005
        9000 Franklin Square Drive
        Baltimore, MD 21205

**B.**   It is agreed that such insurance as is afforded by this policy as respects the Named Insured THE NEW YORK AND PRESBYTERIAN HOSPITAL, CORNELL UNIVERSITY and THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, applies to the following entities, each as insured:

<u>RETROACTIVE DATE</u>

1.   The Presbyterian Hospital in the City of New York
622 West 168th Street
New York, NY 10032

July 1, 1978

2.   The Society of the New York Hospital
525 East 68th Street
New York, NY 10021

July 1, 1978

3.   The Rogosin Institute, Inc.
429 East 71st Street
New York, NY 10021

November 1, 1983

4.   The Society of the New York Hospital Fund, Inc.
525 East 68th Street
New York, NY 10021

July 1, 1987

5.   Royal Charter Properties, Inc., Royal Charter Properties Westchester, Inc.,
and Royal Charter Properties East, Inc.
but solely as respects their interests as lessors of real property to:
          The Society of the New York Hospital
          The Rogosin Institute, Inc.

July 1, 1987

6.   The New York Hospital Registry Program
but solely as respect its liability arising out of operations on behalf
of the Named Insured.

July 1, 1987

7.   The N.Y.H. Health Plan, Inc.
333 East 38th Street
New York, NY 10016
          and
525 East 68th Street
New York, NY 10021

August 7, 1995

8.   The New York Hospital Community Health Plan
333 East 38th Street
New York, NY 10016
          and
525 East 68th Street
New York, NY 10021

August 7, 1995

9.   The N.Y.H. Health Plan Services, Inc.
525 East 68th Street
New York, NY 10021

June 10, 1996

10.   NYH IPA, Inc.
525 East 68th Street
New York, NY 10021

October 8, 1996

11.   Network Recovery Services, Inc.
623 Stewart Avenue
Suite 205
Garden City, NY 11530

May 3, 1993

Network Recovery Services, Inc. is an insured only for the coverage
as provided under Part 2 of this policy.

12.   The Washington Heights-Inwood Ambulatory Care Network Corporation
161 Fort Washington Street
New York, NY 10032

July 1, 1984

13.   Presbyterian Health Resources, Inc.
622 West 168th Street
New York, NY 10031

June 11, 1996

14.   Advanced Child Care Center                          March 11, 1994
130 Fort Washington Avenue
New York, NY 10032

Advanced Child Care Center is an **Insured** only for the coverage as
provided under Part 2 of this policy.

15.   The Columbia-Presbyterian Medical Center Fund, Inc.           March 11, 1994
100 Haven Avenue, Suite 29 D
New York, NY 10032

The Columbia-Presbyterian Medical Center Fund, Inc. is an **Insured**
only for the coverage as provided under Part 2 of this policy.

16.   Harkness Hall Club, Inc.                                March 11, 1994
627 West 165th Street
New York, NY 10032

Harkness Hall Club, Inc. is an **Insured** only for the coverage as
provided under Part 2 of this policy and only as respects the
private functions of the **Named Insured.**

17.   Harlem River Realty Corporation                        March 11, 1994
627 West 165th Street

Harlem River Realty Corporation is an **Insured** only for the coverage
as provided under Part 2 of this policy and solely as respects
their interests as lessors of real property to the **Named Insured.**

18.   Manhattan North Realty Corporation                   March 11, 1994
627 West 165th Street
New York, NY 10032

Manhattan North Realty Corporation is an **Insured** only for the
coverage as provided under Part 2 of this policy and solely as
respects their interests as lessors of real property to the **Named Insured.**

19.   Presbyterian Funding Corporation                      March 11, 1994
627 West 165th Street
New York, NY 10032

Presbyterian Funding Corporation is an **Insured**
only for the coverage as provided under Part 2 of this policy.

20.   Presbyterian Hospital Infant and Child Care Center          June 1, 1995
(formerly known as Advanced Child Care Center)
61 Haven Avenue
New York, NY 10032

Presbyterian Hospital Infant and Child Care Center (formerly
known as Advanced Child Care Center) is an **Insured** only for
the coverage as provided under Part 2 of this policy.

21.   Columbia Presbyterian Health System, Inc.              June 25, 1992
650 Madison Avenue
New York, NY 10032

22.   Presbyterian Systems Corporation                      July 1, 1996
622 West 168th Street
New York, NY 10032

23.   New York Presbyterian Healthcare Network, Inc.         January 1, 1993

24.   Columbia Ophthalmology Consultants, Inc.              July 1, 1978

25.   Columbia University Healthcare, Inc.                 July 1, 1978

26.   New York-Presbyterian System Select Health, LLC     November 18, 2002
440 Ninth Avenue, Suite 11A
New York, NY 10001

| | | |
|---|---|---|
| 27. | New York-Presbyterian Healthcare System, Inc.<br>1320 York Avenue, 7th Floor<br>New York, NY 10021 | October 29, 1993 |
| 28. | 61st St. Service Corporation<br>14 E. 60th St.<br>New York, NY 10022 | January 1, 2005 |

**C.**   It is agreed that such insurance as is afforded by this policy as respects the Named Insured YALE-NEW HAVEN HOSPITAL and YALE UNIVERSITY applies to the following entities, each as insured.

**RETROACTIVE DATE**

| | | |
|---|---|---|
| 1. | Yale New Haven Health Services Corporation<br>20 York Street<br>New Haven, CT 06504 | March 13, 1986 |
| 2. | Temple Surgical Center<br>40-60 Temple Street<br>New Haven, CT 06510 | September 23, 1994 |
| 3. | Temple Radiology Group<br>40-60 Temple Street<br>New Haven, CT 06510 | September 23, 1994 |
| 4. | Women's Surgical Center<br>40-60 Temple Street<br>New Haven, CT 06510 | September 23, 1994 |
| 5. | Temple Nuclear Medicine, P.C.<br>40-60 Temple Street<br>New Haven, CT 06510 | September 23, 1994 |
| 6. | Yale Preferred Health, Inc.<br>23 Malden Lane<br>North Haven, CT 06473 | July 1, 1995 |
| 7. | Yale-New Haven Ambulatory Services Corporation<br>40-60 Temple Street<br>New Haven, CT 06510 | September 23, 1994 |
| 8. | Bridgeport Hospital and Health Care Services, Inc.<br>(formerly known as Southern Connecticut Health System, Inc.)<br>267 Grant Street<br>Bridgeport, CT | October 1, 1985 |

Bridgeport Hospital and Health Care Services, Inc.
(formerly known as Southern Connecticut Health System, Inc.)
Includes:
    Bridgeport Hospital
    Bridgeport Hospital Foundation, Inc.
    Bridgeport Hospital Auxiliary, Inc.
        Coverage as is afforded to Bridgeport Hospital Auxiliary, Inc. is limited to
        the activities of the Auxiliary which supplement the internal services and
        activities to patients and personnel at Bridgeport Hospital under the
        supervision of the administration of such Bridgeport Hospital, the promotion
        of good public relations between Bridgeport Hospital and the community,
        and the initiation of fund raising projects for the benefit of Bridgeport
        Hospital, subject to the approval of the Board of Directors of Bridgeport
        Hospital.
    SCHS Properties, Inc.
    Nova Med Corporation
    United Home Care, Inc.
    Ahlbin Centers for Rehabilitation Medicine, Inc.
    Bridgeport Health Network
    Southern Connecticut Health Network, Inc.
    Park City which includes:
        The Park City Hospital, Inc.
        Greater Bridgeport Health Services Corporation
        Park City Hospital Foundation, Inc.
        Park City Management Corporation
        Emergency Medical Associates, Inc.

3

Coverage as is afforded to Park City and its affiliates by this policy applies only to the Prior Acts Period.

Nova Med Corporation is an insured under this policy for its operations from July 1, 1985 through November 30, 2002.

9.  Yale New Haven Refractive Laser Center, L.L.C.                    January 1, 1998
    229 George Street
    New Haven, CT 06510

10. Greenwich Health Care Services, Inc.                              October 1, 1985
    5 Perryridge Road
    Greenwich, CT 06830

    Greenwich Health Care Services, Inc. includes:
        Greenwich Hospital Association
        Greenwich Health Services, Inc.
        The Perryridge Corporation
        Greenwich Nursing and Health Care Registry, Inc.
        Future Care, Inc.

    Coverage as is afforded to Greenwich Nursing and Health Care Registry, Inc.
    and Future Care, Inc. by this policy applies only to the Prior Acts Period.

11. York Enterprises, Inc.                                           July 1, 1983
    50 York St.
    New Haven, CT.

    York Enterprises, Inc. includes:
        Medical Center Pharmacy and Home Care Center, Inc.
        Medical Center Realty, Inc.

12. Yale New Haven Network Corporation                              March 30, 1998

13. Temple Recovery Care Center                                     May 18, 2003
    229 George Street
    New Haven, CT 06510

14. Shoreline Surgery Center, LLC                                   April 16, 2003
    111 Goose Lane
    Guilford, CT 06437

15. Bridgeport Renewal, LLC                                         October 15, 2005
    C/O AMS
    350 Fairfield, ave
    Bridgeport, CT  06604

16. Southern Connecticut Health System Properties, Inc. ("SCHS")    October 15, 2005
    267 Grant St.
    Bridgeport, CT  06610

D.  It is agreed that such insurance as is afforded by this policy as respects the **Named Insured** UNIVERSITY OF ROCHESTER
    applies to the following entities, each as insured:

                                                                   **RETROACTIVE DATE**

1.  Strong Physician-Hospital Organization, Inc.                   September 26, 1995
    601 Elmwood Avenue
    Box 612
    Rochester, NY 14642

2.  The Meadows at Westfall, Inc.                                  June 1, 1996
    5901 Lac DeVille Boulevard
    Rochester, NY 14618

3.  Strong Physician-Hospital Organization, Inc.-                  September 26, 1995
    Independent Practice Association
    601 Elmwood Avenue
    Rochester, NY 14642

4.  Strong Partners Health System                                  January 1, 1986
    601 Elmwood Avenue
    Rochester, NY 14642

Strong Partners Health System includes:
    Highland Hospital of Rochester
    Highland Living Center Inc.
    Highland Community Development Corp., Inc.
    Highland Hospital Foundation, Inc.
    Highland Facilities Development Corp, Inc.
    The Highlands at Brighton
    (formerly The Meadows at Westfall, Inc.)

5.    Strong Home Care Group, DBA Visiting Nurse Foundation    April 1, 1999
    2180 Empire Boulevard
    Webster, NY 14580

Strong Home Care Group includes:
    Visiting Nurse Services of Rochester and Monroe County, Inc., which includes:
        Certified Home Health Agency
        Long Term Home Health Care Agency
        Visiting Nurse Hospice
    Community Care of Rochester, Inc., which includes:
        Licensed Home Care Services Agency

6.    Strong Health MCO LLC    October 8, 1997
    900 South Avenue, Suites 207 and 204,
    Rochester, NY 14620.

7.    Strong Health MCO IPA, Inc.    October 16, 1998
    900 South Avenue, Suites 207 and 204,
    Rochester, NY 14620.

8.    Upstate Health Partners MSO, Inc.    June 19, 2000
    411 Canisteo Street,
    Hornell, NY 14843

**ENDORSEMENT NO. 2**

**LIMITS OF LIABILITY**

The limits of liability as shown on the Declarations Page are as follows:

**Part 1. Professional Liability**

 each **Claim** no annual aggregate for University of Rochester and any **Insured** sponsored by University of Rochester;

each **Claim** no annual aggregate for The Johns Hopkins Hospital, The Johns Hopkins University and any **Insured** sponsored by either of such **Named Insureds** (provided that the limits of liability shall be ⬛⬛⬛⬛ in respect of Howard County General Hospital, Howard Home Health Corporation and Howard County Home Services, Inc. and any **Insured** sponsored by any of the foregoing);

$8,000,000 each **Claim** no annual aggregate for:

   i)   The Columbia University Medical Center of The New York and Presbyterian Hospital and its predecessor The Presbyterian Hospital in the City of New York; and
   ii)  The Trustees of Columbia University in the City of New York;

and any **Insured** sponsored by such **Named Insureds**;

each **Claim** no annual aggregate for:

   i)   The New York Weill Cornell Medical Center of The New York and Presbyterian Hospital and its predecessor The Society of The New York Hospital; and
   ii)  Cornell University;

and any **Insured** sponsored by such **Named Insureds**;

each **Claim** no annual aggregate for Yale-New Haven Hospital, Yale University and any **Insured** sponsored by either of such **Named Insureds** (provided that the limits of liability shall be ⬛⬛⬛⬛ in respect of Bridgeport Hospital and Health System, Inc. and Greenwich Health Care Services, Inc. and any **Insured** sponsored by any of the foregoing);

**Part 2. Commercial General Liability including Personal and Advertising Injury**

 each **Claim** no annual aggregate for University of Rochester and any **Insured** sponsored by University of Rochester;

each **Claim** no annual aggregate for The Johns Hopkins Hospital, The Johns Hopkins University and any **Insured** sponsored by either of such **Named Insureds**

$2,500,000 each **Claim** no annual aggregate for:

   i)   The New York and Presbyterian Hospital and its predecessors The Presbyterian Hospital in the City of New York and The Society of the New York Hospital;
   ii)  Cornell University; and
   iii) The Trustees of Columbia University in the City of New York;

and any **Insured** sponsored by such **Named Insureds**;

each **Claim** no annual aggregate for Yale-New Haven Hospital, Yale University and any **Insured** sponsored by either of such **Named Insureds**

**Part 3. Administrative Events**

Note, the following sublimits of liability only apply to **Administrative Events** against Physicians, Dentists and other professionals who are **Insureds**, except as respects any administrative or judicial proceeding instituted by a government agency directly or indirectly based upon, arising out of or resulting from the Health Insurance Portability and Accountability Act of 1996, as amended, in which case the following sublimits of liability apply to Physicians, Dentists, other professionals who are **Insureds** and employees of a **Named Insured** or Endorsement No. 1 **Insured**. The following sublimits of liability do not apply to **Administrative Events** against the **Named Insured** or an Endorsement No. 1 **Insured**:

   a.  $50,000 sublimit of liability for each **Administrative Event** against each Physician, Dentist, other professional who is an **Insured** or employee of a **Named Insured** or Endorsement No. 1 **Insured**, and subject to

   b.  $150,000 annual aggregate sublimit of liability for all **Administrative Events** against each Physician, Dentist, other professional who is an **Insured** or employee of a **Named Insured** or Endorsement No. 1 **Insured**.

The above referenced sublimits of liability for **Administrative Events** against a Physician, Dentist, other professional who is an **Insured** or employee of a **Named Insured** or Endorsement No. 1 **Insured** are included within the applicable each **Claim** limit of liability stated above for Part 1 of this policy.

6

ENDORSEMENT NO. 3

**COMMERCIAL GENERAL LIABILITY INSURANCE**

This Endorsement modifies such insurance as is afforded by the provisions of this policy relating to the following COMMERCIAL GENERAL LIABILITY INSURANCE

**REAL PROPERTY - LIABILITY - FIRE**

The Property Damage liability coverage applies to Property Damage to structures or portions thereof rented to or occupied by the Named Insured or an Endorsement No. 1 Insured, including fixtures permanently attached thereto, if such Property Damage arises out of fire, subject to the following additional provisions:

All of the exclusions of this policy, other than in Part 2, Section II.Q, are deleted and replaced by the following:

(a)     This insurance does not apply to liability assumed by the Insured under any contract or agreement.

(b)     The limit of **Property Damage** liability as respects the Real Property-Liability-Fire-Coverage is ████████ each loss.

ENDORSEMENT NO. 4

**WAIVER OF IMMUNITY OF CHARITABLE INSTITUTIONS**

With respect to any **Named Insured** or an Endorsement No. 1 Insured domiciled in Maryland, pursuant to Article 48A – Section 480 of the Annotated Code of Maryland, the Company shall be estopped from asserting, as a defense to any Claim covered by this policy, that any such Insured is immune from liability on the ground that it is a charitable institution.

ENDORSEMENT NO. 5

**CORNELL UNIVERSITY**

a.     It is agreed that such insurance as is afforded by this policy under Part 2 applies to Cornell University, as Named Insured, but solely as respects its liability arising out of the ownership, operation, maintenance or use of the following described premises, including the ways immediately adjacent thereto:

1.     411 East 69th Street
2.     515 East 71st Street
3.     1300 York Avenue
4.     1303 York Avenue, a/k/a 1307 York Avenue and 434 East 70th Street
5.     420 East 70th Street – Lasdon House
6.     423-427 East 69th Street – Livingston – Farrand
7.     445 East 69th Street – Olin Hall

The Retroactive Date for locations 1, 2 and 3 is July 1, 1978
The Retroactive Date for location 4 is July 1, 1993.
The Retroactive Date for locations 5, 6 and 7 is July 1, 1995.

b.     It is further agreed that, effective July 1, 1993, such insurance as is afforded by this policy under Part 2 applies to Cornell University, as Named Insured, arising out of the activities and operations of Weill Medical College of Cornell University (formerly known as Cornell University Medical College).

ENDORSEMENT NO. 6

**UNIVERSITY OF ROCHESTER, THE JOHNS HOPKINS UNIVERSITY, YALE UNIVERSITY**

It is agreed that such insurance as is afforded by this policy under Part 2 applies, subject to the following provisions:

(a)     As respects the **Named Insured** University of Rochester, such insurance applies solely to the premises, activities and operations under the control of the University Medical Center.

(b)     As respects the **Named Insured** The Johns Hopkins University, such insurance applies solely to the block bounded by Monument, Wolfe, New Jefferson and Orleans Streets and Broadway, and to the block bounded by East Monument Street, Rutland Avenue, East Madison Street and North Wolfe Street, all in Baltimore, Maryland.

(c)     As respects the **Named Insured** Yale University, such insurance applies solely to the land and buildings in Connecticut owned, leased and/or occupied by Yale University School of Medicine, Yale University School of Nursing and Yale University Health Services.

7

### ENDORSEMENT NO. 7

#### MEDICARE ACCESS AGREEMENT

In the event that the Secretary of Health and Human Services or the Comptroller general of the United States or their representatives determine that this policy is a contract described in Section 1861(v) (1) (I) of the Social Security Act, 42 U.S.C. 1395x(v)(1)(I), the Company agrees that until the expiration of four years after the furnishing of services pursuant to this policy, the Company shall make available upon written request to an Insured or the Secretary of Health and Human Services, or upon request to the Comptroller General of the United States, or any of their duly authorized representatives, this policy, and all books, documents and records of the Company that are necessary to certify the nature and extent of costs paid by an Insured pursuant to this policy. If the Company carries out any of its duties under this policy through a contract with a value or cost of $10,000 or more over a twelve month period, with a related organization as defined in 42 C.F.R. 405.427, such subcontracts shall contain a clause to the effect that until the expiration of four years after furnishing of such services pursuant to such subcontract, the relayed organization shall make available, upon written request to the Secretary of Health and Human Services, or upon request to the Comptroller General of the United States, or any of their duly authorized representatives, the subcontract, and all books, documents, and records of such organizations that are necessary to verify the nature and extent of such costs. In the event access to books, documents and records with respect to an Insured is requested pursuant to this Endorsement, the Company shall immediately notify such Insured, and the books, documents and records shall also be made available to such Insured.

### ENDORSEMENT NO. 8

#### HOWARD HUGHES INSTITUTE

It is agreed that such insurance as is afforded by this policy as respects the Named Insured Yale University applies to:

(a)     Howard Hughes Medical Institute ("the Institute") as insured, but solely as respects liability arising from operations or activities conducted in collaboration with such Named Insured, and

(b)     any professional scientist employed by the Institute and assigned by the Institute to research programs conducted in collaboration between the Institute and such Named Insured, as insured, but solely as respects his or her liability arising out of the performance of his or her duties in connection with such assignment.

### ENDORSEMENT NO. 9

#### COLUMBIA UNIVERSITY, CORNELL UNIVERSITY

It is agreed that each of the following is an Insured under Parts 1 and 2 of this policy to the extent set forth below:

Any employee of Columbia University or of Cornell University, other than a **Physician, Dentist** or medical or dental resident, intern or fellow of The Presbyterian Hospital in the City of New York or of Columbia University or Cornell University, while acting within the scope of his or her duties for the Named Insured, The Presbyterian Hospital in the City of New York, under the terms of an affiliation agreement between such Named Insured and Columbia University or Cornell University.

The Retroactive Date for this Endorsement is July 1, 1988.

When used in this Endorsement, The Presbyterian Hospital in the City of New York shall also mean The New York and Presbyterian Hospital.

### ENDORSEMENT NO. 10

#### COMMUNITY PREMIER PLUS

It is agreed that such insurance as is afforded by this policy as respects the Named Insured The Presbyterian Hospital in the City of New York, shall apply to its liability arising out of its participation in the not-for-profit 501(c)(3) membership corporation known as Community Premier Plus.

It is expressly understood and agreed that insurance provided by this policy does not apply to any member of Community Premier Plus other than The Presbyterian Hospital in the City of New York.

The Retroactive Date for this Endorsement is June 1, 1996.

When used in this Endorsement, The Presbyterian Hospital in the City of New York shall also mean The New York and Presbyterian Hospital.

8

ENDORSEMENT NO. 11

<u>PUNITIVE DAMAGES EXCLUSION</u>

This policy does not apply to Damages directly or indirectly based upon, arising out of or resulting from the liability of any Insured for, or obligation of any Insured to pay by reason of judgment or settlement for liability, punitive or exemplary or other multiplied portion of any damage award.

ENDORSEMENT NO. 12

<u>ADVERTISEMENT APPROVAL AUTHORITY</u>

As respects DEFINITIONS APPLICABLE TO PARTS 1 AND 2, Advertisement:

A.    As respects the Named Insured THE JOHNS HOPKINS HOSPITAL and THE JOHNS HOPKINS UNIVERSITY, the following Endorsement No. 1 Insureds:

Johns Hopkins Bayview Medical Center
The Johns Hopkins Medical Services Corporation
Wyman Park Medical Associates
Broadway Services, Incorporated
Johns Hopkins Health Systems Corporation
The Johns Hopkins Hospital Endowment Fund, Inc.
The Johns Hopkins Home Care Alternatives, Inc.
The Johns Hopkins Home Care, Inc.
The Johns Hopkins Health Services, Inc.
The Johns Hopkins Outpatient Center Condominium, Inc.
The Johns Hopkins Home Care Group, Inc.
Johns Hopkins Pediatrics at Home, Inc.
Johns Hopkins Pharmaquip, Inc.
The Johns Hopkins Suburban Health Center Limited Partnership
Broadway Medical Management Corp.
Johns Hopkins Suburban Health Group at Green Spring Station, Inc.
Ophthalmology Associates, LLC
Johns Hopkins Health Care, LLC
EHP Employee Health Plans, Inc.
Priority Partners Managed Care Organization, Inc.
The Foundation for Advanced Education in the Sciences, Inc. (FAES)
Johns Hopkins Imaging, L.L.C.
Howard County General Hospital
Howard Home Health Corporation
Howard County Health Services, Inc.
Cedar Emergency Services, Inc.
The Johns Hopkins Home Health Services, Inc.
Central Maryland Heart Center, Inc.
HSI Medical Services Corporation
Ambulatory Blood Gas Services, Inc.
JH Ventures, LLC, which includes:
        JH Ventures, LLC/JHHC Participating Physicians Series
        JH Ventures, LLC/Green Spring Patient First Series
        JH Ventures, LLC/Frederick Neonatal Services Series
        JH Ventures, LLC/Howard County Services Series
        JH Ventures, LLC/Scott Maurer, M.D. Series
        JH Ventures, LLC/Johns Hopkins Emergency Medical Services, LLC Series
        JH Ventures, LLC/Broadway Acquisition and Development Series
The Johns Hopkins Parking Corporation
JHCO, LLC
Integrated Renal Solutions, LLC
Howard Hospital Foundation, Inc.
GammaPlus Baltimore, LLC

B.    As respects the Named Insured UNIVERSITY OF ROCHESTER, the following Endorsement No. 1 Insureds:

Strong Physician-Hospital Organization, Inc.
The Meadows at Westfall, Inc.
Strong Physician-Hospital Organization, Inc.-Independent Practice Association
Strong Partners Health System, which includes:
        Highland Hospital of Rochester
        Highland Living Center Inc.

Highland Community Development Corp., Inc.
Highland Hospital Foundation, Inc.
Highland Facilities Development Corp, Inc.
The Highlands at Brighton
Strong Home Care Group, DBA Visiting Nurse Foundation, which includes:
    Visiting Nurse Services of Rochester and Monroe County, Inc., which includes:
        Certified Home Health Agency
        Long Term Home Health Care Agency
        Visiting Nurse Hospice
        Community Care of Rochester, Inc., which includes:
        Licensed Home Care Services Agency
Strong Health MCO LLC
Strong Health MCO IPA, Inc.
Upstate Health Partners MSO, Inc.


C.    As respects the Named Insured THE NEW YORK AND PRESBYTERIAN HOSPITAL, CORNELL UNIVERSITY and THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, the following Endorsement No. 1 Insureds:

The Presbyterian Hospital in the City of New York
The Society of the New York Hospital
The Rogosin Institute, Inc.
The Society of the New York Hospital Fund, Inc.
Royal Charter Properties, Inc., Royal Charter Properties Westchester, Inc., and Royal Charter Properties East, Inc., but solely as respects their interests as lessors of real property to:
    The Society of the New York Hospital
    The Rogosin Institute, Inc.
The New York Hospital Registry Program, but solely as respect its liability arising out of operations on behalf of the Named Insured.
The N.Y.H. Health Plan, Inc.
The New York Hospital Community Health Plan
The N.Y.H. Health Plan Services, Inc.
NYH IPA, Inc.
Network Recovery Services, Inc.
The Washington Heights-Inwood Ambulatory Care Network Corporation
Presbyterian Health Resources, Inc.
Advanced Child Care Center
The Columbia-Presbyterian Medical Center Fund, Inc. Harkness Hall Club, Inc.
Harlem River Realty Corporation
Manhattan North Realty Corporation
Presbyterian Funding Corporation
Presbyterian Hospital Infant and Child Care Center (formerly known as Advanced Child Care Center)
Columbia Presbyterian Health System, Inc.
Presbyterian Systems Corporation
New York Presbyterian Healthcare Network, Inc.
Columbia Ophthalmology Consultants, Inc.
Columbia University Healthcare, Inc.
New York-Presbyterian System Select Health, LLC

**ENDORSEMENT NO. 13**

**PERSONAL AND ADVERTISING INJURY – BUSINESS OF ENDORSEMENT NO. 1 INSUREDS**

As respects DEFINITIONS APPLICABLE TO PARTS 1 AND 2, Personal and Advertising Injury:

D.  As respects the Named Insured THE JOHNS HOPKINS HOSPITAL and THE JOHNS HOPKINS UNIVERSITY, the following Endorsement No. 1 Insureds:

Johns Hopkins Bayview Medical Center
The Johns Hopkins Medical Services Corporation
Wyman Park Medical Associates
Broadway Services, Incorporated
Johns Hopkins Health Systems Corporation
The Johns Hopkins Hospital Endowment Fund, Inc.
The Johns Hopkins Home Care Alternatives, Inc.
The Johns Hopkins Home Care, Inc.
The Johns Hopkins Health Services, Inc.
The Johns Hopkins Outpatient Center Condominium, Inc.
The Johns Hopkins Home Care Group, Inc.
Johns Hopkins Pediatrics at Home, Inc.
Johns Hopkins Pharmaquip, Inc.
The Johns Hopkins Suburban Health Center Limited Partnership
Broadway Medical Management Corp.
Johns Hopkins Suburban Health Group at Green Spring Station, Inc.
Ophthalmology Associates, LLC
Johns Hopkins Health Care, LLC
EHP Employee Health Plans, Inc.
Priority Partners Managed Care Organization, Inc.
The Foundation for Advanced Education in the Sciences, Inc. (FAES)
Johns Hopkins Imaging, L.L.C.
Howard County General Hospital
Howard Home Health Corporation
Howard County Health Services, Inc.
Cedar Emergency Services, Inc.
The Johns Hopkins Home Health Services, Inc.
Central Maryland Heart Center, Inc.
HSI Medical Services Corporation
Ambulatory Blood Gas Services, Inc.
JH Ventures, LLC, which includes:
    JH Ventures, LLC/JHHC Participating Physicians Series
    JH Ventures, LLC/Green Spring Patient First Series
    JH Ventures, LLC/Frederick Neonatal Services Series
    JH Ventures, LLC/Howard County Services Series
    JH Ventures, LLC/Scott Maurer, M.D. Series
    JH Ventures, LLC/Johns Hopkins Emergency Medical Services, LLC Series
    JH Ventures, LLC/Broadway Acquisition and Development Series
The Johns Hopkins Parking Corporation
JHCO, LLC
Integrated Renal Solutions, LLC
Howard Hospital Foundation, Inc.
GammaPlus Baltimore, LLC

E.  As respects the Named Insured UNIVERSITY OF ROCHESTER, the following Endorsement No. 1 Insureds:

Strong Physician-Hospital Organization, Inc.
The Meadows at Westfall, Inc.
Strong Physician-Hospital Organization, Inc.-Independent Practice Association
Strong Partners Health System, which includes:
    Highland Hospital of Rochester
    Highland Living Center Inc.
    Highland Community Development Corp., Inc.
    Highland Hospital Foundation, Inc.
    Highland Facilities Development Corp, Inc.
    The Highlands at Brighton
Strong Home Care Group, DBA Visiting Nurse Foundation, which includes:
    Visiting Nurse Services of Rochester and Monroe County, Inc., which includes:
        Certified Home Health Agency
        Long Term Home Health Care Agency
        Visiting Nurse Hospice
        Community Care of Rochester, Inc., which includes:
        Licensed Home Care Services Agency

Strong Health MCO LLC
Strong Health MCO IPA, Inc.
Upstate Health Partners MSO, Inc.

F.   As respects the Named Insured THE NEW YORK AND PRESBYTERIAN HOSPITAL, CORNELL UNIVERSITY and THE
TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, the following Endorsement No. 1 Insureds:

The Presbyterian Hospital in the City of New York
The Society of the New York Hospital
The Rogosin Institute, Inc.
The Society of the New York Hospital Fund, Inc.
Royal Charter Properties, Inc., Royal Charter Properties Westchester, Inc., and Royal Charter Properties East, Inc., but solely as
respects their interests as lessors of real property to:
        The Society of the New York Hospital
        The Rogosin Institute, Inc.
The New York Hospital Registry Program, but solely as respect its liability arising out of operations on behalf of the Named Insured.
The N.Y.H. Health Plan, Inc.
The New York Hospital Community Health Plan
The N.Y.H. Health Plan Services, Inc.
NYH IPA, Inc.
Network Recovery Services, Inc.
The Washington Heights-Inwood Ambulatory Care Network Corporation
Presbyterian Health Resources, Inc.
Advanced Child Care Center
The Columbia-Presbyterian Medical Center Fund, Inc. Harkness Hall Club, Inc.
Harlem River Realty Corporation
Manhattan North Realty Corporation
Presbyterian Funding Corporation
Presbyterian Hospital Infant and Child Care Center (formerly known as Advanced Child Care Center)
Columbia Presbyterian Health System, Inc.
Presbyterian Systems Corporation
New York Presbyterian Healthcare Network, Inc.
Columbia Ophthalmology Consultants, Inc.
Columbia University Healthcare, Inc.
New York-Presbyterian System Select Health, LLC

### ENDORSEMENT NO. 14

### CLAIM REPORTING PERSONS OR ORGANIZATIONS

As respects CONDITIONS APPLICABLE TO PARTS 1 AND 2, Sections 2(a)1 and 2(b)1:

Risk Manager or Legal Department (or equivalent thereof) of:

Johns Hopkins Bayview Medical Center
Howard County General Hospital
Bridgeport Hospital
Greenwich Hospital Association

### ENDORSEMENT NO. 15

### TERRORISM EXCLUSION

Notwithstanding anything contained in the policy to the contrary, and specifically as respects PART 2 - COMMERCIAL GENERAL
LIABILITY, I. INSURING AGREEMENTS: Coverage A: Bodily Injury Liability and Coverage B: Property Damage Liability, it is understood
and agreed that the policy will not apply to any Claim directly or indirectly caused by, resulting from or in connection with:

(a)  any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss; or

(b)  any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism.

For the purpose of this Exclusion, an "act of terrorism" means:

(a)  an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons,
whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious,
ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the

public, in fear; or

(b)    a violent act or an act that is dangerous to:

    (i)    human life;
    (ii)   property; or
    (iii)  infrastructure;

by any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

However, it is understood and agreed that this Exclusion shall not apply to Damages sustained by any patient arising out of a **Medical Incident** or a **Managed Care Incident**.

In the event any portion of this Exclusion is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**
-----------------------------------------------------------------X

DIANE SHAMASH BARTSCHERER and
JOSEPH BARTSCHERER,

*Plaintiffs,*

- *against* -

DANIEL H. SMITH, M.D.

*Defendant.*

-----------------------------------------------------------------X

To the above named defendant(s):

INDEX NO. *39246/2005*
*DATE FILED 12/29/05*

Plaintiff designates
**KINGS COUNTY**
as the place of trial

The basis of the venue
is plaintiff's place of
Residence

**SUMMONS**

Plaintiffs reside at
96 Remsen Street #1
Brooklyn, NY 11201

**COUNTY OF KINGS**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken for the relief demanded herein.

**A COPY OF THIS SUMMONS WAS FILED WITH THE CLERK OF THE COURT, KINGS COUNTY ON** *December 29, 2005* **IN COMPLIANCE WITH CPLR §§305(a) AND 306(a).**

Dated: New York, New York
December 28, 2005

KRAMER, DILLOF, LIVINGSTON & MOORE
By: _____
Carmine A. Rubino, Esq.
Attorneys for Plaintiff
217 Broadway
New York, New York 10007
Tel: (212)267-4177

Defendant's Address:

DANIEL H. SMITH, M.D.

4 Rutland Road
Scarsdale, New York 10583

JAN.19'2006 03:43                                           #1552 P.003

CAR/ec

### SUPREME COURT OF THE STATE OF NEW YORK
### COUNTY OF KINGS

---------------------------------------------X

DIANE SHAMASH BARTSCHERER and
JOSEPH BARTSCHERER,

                              Plaintiffs,

              -against-

DANIEL H. SMITH, M.D.

                              Defendant.

-----------------------------------------------X

Index No.: 39246/05

*are Filed*
*12/29/05*

**VERIFIED COMPLAINT**

Plaintiffs, above named, complaining of the defendants by their attorneys, KRAMER,

DILLOF, LIVINGSTON & MOORE, ESQS., respectfully allege:

### AS AND FOR THE FIRST CAUSE OF ACTION

1.       At all times herein mentioned, the defendant DANIEL H. SMITH, M.D.,

was a physician duly licensed to practice medicine in the State of New York.

2.       At all times herein mentioned, the defendant DANIEL H. SMITH, M.D.,

was an agent, servant, and/or employee of the NEW YORK PRESBYTERIAN HOSPITAL.

3.       At all times herein mentioned, the plaintiff DIANE SHAMASH

BARTSCHERER was a patient of defendant DANIEL H. SMITH, M.D.

4.       Beginning in or about December 1993 and continuing through in or about

January 2005, plaintiff DIANE SHAMASH BARTSCHERER was a patient of the defendant,

his agents, servants and/or employees, under the medical diagnosis, care and treatment of the

defendant, his agents, servants and/or employees and as a result of the failure to properly and

carefully diagnosis, care for and treat plaintiff DIANE SHAMASH BARTSCHERER ,

1

including but not limited to the failure to properly, timely and carefully diagnose, care for and treat plaintiff **DIANE SHAMASH BARTSCHERER's** cervical condition, including the failure to properly diagnose, care for, and treat her cervical cancer, plaintiff **DIANE SHAMASH BARTSCHERER** sustained severe injuries and complications.

5. By reason of the foregoing carelessness and negligence of the defendants, their agents, servants and/or employees, the plaintiff sustained severe and serious personal injuries, a severe shock to her nervous system and certain internal injuries and was caused to suffer severe physical pain and mental anguish as a result thereof, and upon information and belief these injuries are of a permanent and lasting nature; that plaintiff was confined to her bed, and home as a result thereof, and was incapacitated from attending to her regular activities, and there was cause to be expended a sum of money for medical and hospital care on her behalf.

6. Said occurrence was due to the carelessness and negligence of the defendants, their agents, servants and/or employees in failing to treat the plaintiff in the accepted and proper medical manner and all without any fault or lack of care on the part of the plaintiff herein.

7. The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

8. This action falls within exceptions to article 16 of the C.P.L.R.

2

## AS AND FOR THE SECOND CAUSE OF ACTION
## LACK OF INFORMED CONSENT

9.    Plaintiff repeats, reiterates and realleges each and every allegation contained in those paragraphs of the complaint marked and designated 1. through 8. inclusively, with the same force and effect as if hereinafter set forth at length.

10.    Defendants failed to inform plaintiff DIANE SHAMASH BARTSCHERER of the risks, hazard and alternatives connected with the procedures utilized and treatment rendered, so that an informed consent could be given.

11.    Reasonably prudent persons in the plaintiff's position would not have undergone the procedures utilized and treatment rendered, if they had been fully informed of the risks, hazards and alternatives connected with said procedures and treatment.

12.    As a consequence of the foregoing there was no informed consent to the procedures utilized and treatment rendered to plaintiff DIANE SHAMASH BARTSCHERER.

13.    The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

## AS AND FOR THE THIRD CAUSE OF ACTION
## FOR LOSS OF SERVICES ON BEHALF
## OF PLAINTIFF JOSEPH BARTSCHERER

14.    Plaintiff repeats, reiterates and realleges each and every allegation contained in these paragraphs of the complaint marked and designated 1. through 13. inclusive with the same force and effect as if hereinafter set forth at length.

15.    By reason of the foregoing, plaintiff JOSEPH BARTSCHERER has been deprived of the services of his wife, from the date of malpractice to the present and

3

02/05/2007 10:22 FAX 847 5726338    SHAND MORAHAN    ☑034/069

JAN.19'2006 03:44    ☎1852 P.008

continuing in the future, and was caused to become obligated to expend sums of money for

medical and hospital care on her behalf.

WHEREFORE, plaintiffs demand judgment against defendants in such sum as a jury

would find fair, adequate and just.

Dated: New York, New York.
     December 28, 2005

Yours, etc...

By: Carmine A. Rubino, Esq.
KRAMER, DILLOF, LIVINGSTON & MOORE
Attorneys for Plaintiffs
217 Broadway
New York, New York 10007
Tel: (212) 267-4177

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------X

DIANE SHAMASH BARTSCHERER and
JOSEPH BARTSCHERER,

                                    Plaintiff(s),

            - against -

DANIEL H. SMITH, M.D.,

                                    Defendant.

-------------------------------------------------------X

INDEX NO.:

CERTIFICATE OF MERIT

CARMINE A. RUBINO, an attorney duly admitted to practice in the Courts of New York State, and a member of the firm KRAMER, DILLOF, LIVINGSTON & MOORE, attorneys for the plaintiff in the within action, hereby affirms under penalty of perjury:

I have reviewed the facts of this case and have consulted with at least one physician who is licensed to practice medicine in the State of New York and who I reasonably believe is knowledgeable in the relevant issues involved in this matter. I have concluded on the basis of the review and the consultation that there is a reasonable basis for the commencement of this action.

Dated: New York, New York
       December 28, 2005

                                    _____
                                    CARMINE A. RUBINO

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
————————————————————————X    INDEX NO.:

DIANE SHAMASH BARTSCHERER and
JOSEPH BARTSCHERER,

                       *Plaintiff(s),*

      - against -                   ATTORNEY'S VERIFICATION

DANIEL H. SMITH, M.D.,

                       *Defendant.*
————————————————————————X

        CARMINE A. RUBINO, an attorney duly admitted to practice in the Courts of New York State, and a member of the firm KRAMER, DILLOF, LIVINGSTON & MOORE, attorneys for the plaintiff in the within action, hereby affirms under penalty of perjury:

        That he has read the within complaint and knows the contents thereof, and that the same is true to his own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters he believes it to be true.

        That the sources of his information and knowledge are investigations and records in the file.

        That the reason this verification is made by affirmant and not by the plaintiff is that the plaintiff is not within the County where the attorney has his office.

Dated: New York, New York
       December 28, 2005

                            CARMINE A. RUBINO

JAN.19'2006 03:44

Index No.                              Year 2005

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF KINGS

DIANE SHAMASH BARTSCHERER and
JOSEPH BARTSCHERER

*Plaintiff(s)*,

*- against -*

DANIEL H. SMITH, M.D.

*Defendant*,

## VERIFIED COMPLAINT

### KRAMER, DILLOF, LIVINGSTON & MOORE, ESQS.
*Attorneys for Plaintiff(s)*

*Office and Post Office Address, Telephone*
217 Broadway
New York, New York 10007
(212) 267-4177

To:

All Parties

Attorney(s) for Defendant(s)

# EXHIBIT D

112—**General Release**: joint tortfeasors clause:
    Ind. or corp, 6-72.

JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS

# General Release

**Know That** I, JOSEPH BARTSCHERER, As Executor of the Estate of DIANE SHAMASH
BARTSCHERER, Deceased, and JOSEPH BARTSCHERER, Individually

~~a corporation organized and existing under the laws of the State of~~
                                                                                                **(RELEASOR)**,
in consideration of the sum of    Four Million Eight Hundred Thousand Dollars

received from                                                                        **($ 4,800,000)00**

                                                                                                **(RELEASEE)**,
receipt whereof is hereby acknowledged, releases and discharges the RELEASEE, his heirs, executors, administrators,
successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,
bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments,
extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the
RELEASOR, his heirs, executors, administrators, successors and assigns hereafter can, shall or may, have for, upon,
or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this
RELEASE.

THIS RELEASE and settlement constitutes complete payment for all damages and injuries and is specifically
intended to release the RELEASEE and also is specifically intended to release, whether presently known or unknown,
all other tortfeasors liable or claimed to be liable jointly with the RELEASEE; and, whether presently known or
unknown, all other potential or possible tortfeasors liable or claimed to be liable jointly with the RELEASEE.

Whenever the text hereof requires, the use of gender or singular number shall include the appropriate gender or
plural number as the text of the within instrument may require.

This RELEASE may not be changed orally.

**In Witness Whereof**, the RELEASOR has executed this RELEASE or has caused this RELEASE to be
~~executed by its duly authorized officer and its corporate seal to be hereunto~~ affixed on January 4, 2008 ~~19~~

Executed and delivered in the
presence of:

*[signature: George L. Shapiro]*

GEORGE L. SHAPIRO
Notary Public, State of New York
No. 01SH4816612
Qualified in Queens County
Commission Expires Oct. 31, 200__
CORPORATE SEAL

*[signature]*
Joseph Bartscherer, As Executor of the
Estate of Diane Shamash Bartscherer,
Deceased, and JOSEPH BARTSCHERER,
Individually

112—General Release: joint tortfeasors clause;
ind. or corp. 5-71.

JULIUS BLUMBERG, INC., LAW BLANK PUBLISHERS

# General Release

**Know That** I, JOSEPH BARTSCHERER, As Executor of the Estate of DIANE SHAMASH BARTSCHERER, Deceased, and JOSEPH BARTSCHERER, Individually

~~a corporation organized under the laws of the State of~~

in consideration of the sum of  One Million Dollars

(RELEASOR),

received from

($1,000,000.00)

(RELEASEE),

receipt whereof is hereby acknowledged, releases and discharges the RELEASEE, his heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR, his heirs, executors, administrators, successors and assigns hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE.

THIS RELEASE and settlement constitutes complete payment for all damages and injuries and is specifically intended to release the RELEASEE and also is specifically intended to release, whether presently known or unknown, all other tortfeasors liable or claimed to be liable jointly with the RELEASEE; and, whether presently known or unknown, all other potential or possible tortfeasors liable or claimed to be liable jointly with the RELEASEE.

Whenever the text hereof requires, the use of gender or singular number shall include the appropriate gender or plural number as the text of the within instrument may require.

This RELEASE may not be changed orally.

**In Witness Whereof,** the RELEASOR has executed this RELEASE or has caused this RELEASE to be ~~executed by its duly authorized officer and its corporate seal to be hereunto~~ affixed on  January 4, 2008

Executed and delivered in the
presence of:

_Serge Z. Shapiro_

GEORGE L. SHAPIRO
Notary Public, State of New York
No. 01SH4816612
Qualified in Queens County
Commission Expires Oct. 31, 2010
CORPORATE SEAL

_Joseph Bartscherer_

Joseph Bartscherer, As Executor of the
Estate of Diane Shamash Bartscherer,
Deceased, and JOSEPH BARTSCHERER,
Individually

# EXHIBIT E

# TRAUB LIEBERMAN
# STRAUS &amp; SHREWSBERRY LLP

N E W   Y O R K   |   N E W   J E R S E Y   |   F L O R I D A

Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532

Telephone (914) 347-2600
Facsimile  (914) 347-8898
www.traublieberman.com

October 31, 2007

New York Presbyterian Hospital
Risk Management
622 West 168th Street
PH 2 West
New York, New York 10032

Attention: Helen Salgado-Anderson

|  | Re: | Matter | : | *Diane Shamash Bartscherer and* |
|---|---|---|---|---|
|  |  |  |  | *Joseph Bartscherer v. Daniel H. Smith, M.D.* |
|  |  | Insured | : | Daniel Humphreys Smith, M.D. |
|  |  | Policy No. | : | MM-810488 (5/1/05-5/1/06) |
|  |  | Our File | : | 105.0260 |

Dear Ms. Salgado-Anderson:

I am in receipt of your letter dated October 10, 2007, and the copy of MCIC's Professional/Commercial General Liability Policy Number PR 1106 which you provided in response to prior requests on behalf of Evanston Insurance Company ("Evanston" or the "Company"). It is our understanding that the MCIC policy affords coverage to Dr. Smith for the above-referenced matter with limits of liability of $8 million.

The MCIC policy contains the following "Other Insurance" clause:

OTHER INSURANCE

Except when an Insured has other insurance which would apply to the **Claim** covered under Part 2 of this policy, the insurance afforded by this policy is primary insurance, except when this insurance is stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **Insured** has other insurance which is stated to be applicable to the **Claim** on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.

Helen Salgado-Anderson
New York Presbyterian Hospital
Our File No.: 105.0260
Page 2

When both this insurance and other insurance apply to the **Claim** on the same basis, whether primary excess or contingent, the Company shall not be liable under this policy for a greater proportion of the **Damages** than that stated in the applicable contribution provision below:

(a)     CONTRIBUTION BY EQUAL SHARES. If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of any **Damages** than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the **Damages** is paid, and with respect to any amount of **Damages** not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the **Damages** until such insurer has paid its limit in full or the amount of the **Damages** is paid.

(b)     CONTRIBUTION BY LIMITS.   If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such **Damages** bears to the total applicable limit of liability of all valid and collectible insurance against such **Damages.**

As you know, the Evanston policy contains an "excess" other insurance clause which provides as follows:

4.     Other Insurance: This insurance shall be in excess of the amount of the applicable deductible of this policy and any other valid and collectible insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess over the limits of liability provided in this policy.

Evanston reads the "other insurances" clauses in the respective policies as rendering the MCIC policy primary with the Evanston policy being excess. Evanston further understands that plaintiffs have made a $7.9 million settlement demand which is within the $8 million limits of

Helen Salgado-Anderson
New York Presbyterian Hospital
Our File No.: 105.0260
Page 3

liability available to Dr. Smith under the MCIC policy. I understand that New York Presbyterian is seeking to obtain a more favorable settlement on behalf of Dr. Smith. Given the terms of the "other insurance" clauses in the respective policies, it seems that this matter can be resolved within the limits of the MCIC policy without any contribution from Evanston. Please advise if you read the policies differently or have a contrary understanding of the facts or law.

Thank you for your cooperation and immediate attention to this matter.

Very truly your,

TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP

Robert S. Nobel

cc:    Brian Noonan, Esq.
       Director of Risk Management
       New York Presbyterian Hospital
       Columbia-Presbyterian
       622 West 168th Street
       New York, New York   10032

       Rabinowitz, Boudin, Standard,
       Krinsky & Lieberman, P.C.
       111 Broadway - 11th Floor
       New York, New York 10006-1901

TRAUB LIEBERMAN
TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP

Helen Salgado-Anderson
New York Presbyterian Hospital
Our File No.: 105.0260
Page 4

bcc:    Jerry Gaca
        Evanston Insurance Company
        SMCo. File No.: MM242317

TRAUB LIEBERMAN
TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP